



IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>OMER GUR, )<br>(a/k/a "Omer Gur Geiger") )<br>(Counts 1 – 34) )<br> )<br> )<br>BOAZ BEN CNAAN, )<br>(Counts 1, 4, 10 – 21, 29 – 34) )<br> )<br> )<br>SHLOMO GENISH, )<br>(Counts 1, 5, 34) )<br> )<br>ZION SASON, )<br>(a/k/a "Zion Sasson") )<br>(Counts 1, 34) )<br> )<br>EYAL KATZ, )<br>(Counts 1, 3, 9 – 21, 34) )<br> )<br> )<br>RITA BERKOVICH, )<br>(Counts 1, 7) )<br> )<br>IDO RODES, )<br>(Counts 1, 8) )<br> )<br>GUY MAZON, )<br>(Counts 1, 5) )<br> )<br>SHIMON MIZRAHI, )<br>(Counts 1, 3) )<br> )<br>SHAI YONA, )<br>(a/k/a "Shay Yona") )<br>(Counts 1 – 6, 9, 10, 16 – 19, 26 – 28) )<br> )<br> )<br>Defendants. ) | FILED UNDER SEAL<br><br>4:16CR 17<br><br>18 U.S.C. § 371<br>Conspiracy to Defraud and to Commit<br>Offenses Against the United States<br>(Count 1)<br><br>18 U.S.C. §§ 1546 and 2<br>Visa Fraud<br>(Counts 2 - 8)<br><br>8 U.S.C § 1324(a)(1)(A)(iv), 18 U.S.C. § 2<br>Encouraging and Inducing Illegal Entry<br>(Counts 9 - 14)<br><br>8 U.S.C. § 1324(a)(1)(A)(iii), 18 U.S.C. § 2<br>Harboring Illegal Aliens<br>(Counts 15 - 21)<br><br>8 U.S.C. § 1324(a)(1)(A)(ii), 18 U.S.C. § 2<br>Transporting Illegal Aliens<br>(Counts 22 - 33)<br><br>18 U.S.C. § 1956(h)<br>Conspiracy to Launder Money<br>(Count 34)<br><br>8 U.S.C. § 1324(b), 18 U.S.C.<br>§§ 981(a)(1)(C), 982(a)(1),<br>982(a)(6)(A), 28 U.S.C. § 2461<br>Asset Forfeiture |

## INDICTMENT

February 2016 Term – At Newport News, Virginia

<u>GENERAL ALLEGATIONS</u>

At all times relevant to the Indictment:

A.    <u>The Defendants and Associated Business Entities</u>

1.    OMER GUR, also known as "Omer Gur Geiger" (hererinafter "GUR"), is a Lawful Permanent Resident of the United States who was born in Israel. He first entered the United States via a B-2 visa. At various times from 2004 to the present, he served as the President, Vice President, Registered Agent, and/or Owner for several related companies, including: Stanga, LLC; Venus Enterprise, LLC; Gaya Enterprise, LLC; ESO Properties, LLC; EMO Properties, LLC; Charles Michael Consulting, LLC; Orion Holdings Group, LLC; Zbang, LLC; R. Magedon, LTD; and Rasko, LLC.

2.    The business entities Stanga, LLC, Venus Enterprise, LLC and Gaya Enterprise, LLC, were in the business of marketing and selling retail cosmetics from kiosk locations in mall-type locations in Virginia, Georgia, Pennsylvania, New Jersey, Missouri, Maryland and North Carolina. These businesses marketed and sold skin care products with an emphasis on products from the Dead Sea region of Israel. Although each business entity was formed in the United States, these entities served under the larger business organization known as Rasko (hereinafter "RASKO"), which was based in Israel. Collectively, these business entities are hereinafter referred to as RASKO or "the Company."

3.    EYAL KATZ (hereinafter "KATZ"), is an Israeli national who was ordered to be administratively removed from the United States in 2009 and was given a voluntary departure in 2010. At various times, KATZ served as the President, Vice President, and/or owner for several of these same companies, including: Rasko, LLC; Zbang, LLC; ESO Properties, LLC; EMO Properties, LLC; and Stanga, LLC.

4.     BOAZ BEN CNAAN (hereinafter "BEN CNAAN") is a B-2 visa holder who has resided in the United States for various periods of time since 2007. At various times up to the present, BEN CNAAN served as the area manager for Stanga, LLC, in the Hampton Roads region. He formerly worked for the Company in a salesman role, but was hired as the Hampton Roads manager in early 2013. At times, he resided in Company-leased apartments in Virginia.

5.     SHLOMO GENISH (hereinafter "GENISH") is the area manager for Venus, Enterprise LLC, in the Philadelphia region, covering Pennsylvania, New Jersey and Maryland. He formerly worked for the Company in a salesman role through an H-2B visa for Stanga, LLC in 2008. He became a Lawful Permanent Resident through marriage in 2013 and, at times, resided in the Company-leased apartments in Pennsylvania.

6.     ZION SASON, also known as ""Zion Sasson" (hereinafter "SASON") is the area manager for Gaya Enterprise, LLC, in the Atlanta region. He entered the United States via a B-2 visa in approximately 2005, became a Conditional Lawful Permanent Resident of the United States through marriage in 2012, and, at times, resided in Company-leased apartments in Atlanta.

7.     RITA BERKOVICH (hereinafter "BERKOVICH") is the area assistant manager for Stanga, LLC, in the Hampton Roads region. She entered the United States as a salesperson for the Company in mid-2013 on a B-2 visa. She became a Conditional Lawful Permanent Resident through marriage in 2015, and, at times, resided in Company-leased apartments in Virginia.

8.     IDO RODES (hereinafter "RODES") is a long-term Company employee, having worked in both the Hampton Roads and Atlanta regions. He entered the United States as a salesperson in mid-2013 on a B-2 visa, and, at times, resided in Company-leased apartments in Virginia and Georgia.

9.　GUY MAZON (hereinafter "MAZON") is a long-term Company employee, having worked in both the Hampton Roads and Philadelphia regions. He entered the United States as a salesperson in early 2013 on a B-2 visa. He became a Conditional Lawful Permanent Resident through marriage in 2015, and, at times, resided in Company-leased apartments in Virginia and Pennsylvania.

10.　SHIMON MIZRAHI (hereinafter "MIZRAHI") is a long-term Company employee, having worked in both the Hampton Roads and Atlanta regions. He entered the United States as a salesperson in mid-2012 on a B-2 visa. He became a conditional permanent resident through marriage in 2015, and at times resided in Company-leased apartments in Virginia and Georgia.

11.　SHAI YONA, also known as "Shay Yona" (hereinafter "YONA"), is a long-term Company employee, having worked in the Hampton Roads region. He entered the United States as a salesperson in 2012 on a B-2 visa. He took on an assistant manager role with the Company, and, at times, resided in Company-leased apartments in Virginia.

12.　Stanga, LLC (hereinafter "STANGA") has been registered in North Carolina, Missouri, Virginia, and New Jersey and currently operates primarily from Virginia, with GUR as the organizing member. STANGA operates kiosks at malls located in the Hampton Roads region of Virginia. From in or about 2013 to the present time, BEN CNAAN served has the manager of STANGA's operations. STANGA has two bank accounts with Bank of America, with GUR, KATZ, and BEN CNAAN listed as authorized users.

13.　Gaya Enterprise, LLC (hereinafter "GAYA") is registered in North Carolina and Georgia, with SASON as its organizing member. GAYA operates kiosks at malls located in the Atlanta, Georgia area. From in or about 2013 through the present time, SASON has served as

the manager of GAYA's operations. GAYA has two bank accounts with Bank of America, with GUR and SASON listed as authorized users.

14.    Venus Enterprise, LLC, (hereinafter "VENUS") is registered in Pennsylvania, Maryland, New Jersey and North Carolina, with GENISH as its organizing member. VENUS operates kiosks at malls located in the Philadelphia area of Pennsylvania, including, at times, New Jersey and Maryland. From in or about at least 2012 to the present, GENISH has served as the manager for VENUS' operations. VENUS maintains two bank accounts with Bank of America, with GUR, SASON, and S.V. listed as authorized users.

B.    <u>The B-2 Visa and Nonimmigrant Employment in the United States</u>

15.    A citizen of a foreign country who wishes to enter the United States must first obtain a visa, either a non-immigrant visa for temporary stay, or an immigrant visa for permanent residence. Under United States laws and regulations, non-citizens of the United States ("aliens") are not permitted to work in the United States unless they obtain employment authorization from the United States Government.

16.    Aliens living outside of the United States can apply for a non-immigrant employment-based visa, referred to as an H-2B visa. The H-2B visa permits aliens to work in the United States for a specified, temporary period of time for a specific employer. An employer seeking to employ temporary foreign employees via the H-2B visa must apply via an application process involving at least three steps and at least three government entities: the United States Department of Labor (DOL), the United States Department of Homeland Security (DHS), and the United States Department of State (DOS).

17.    Visitor visas, known as B-2 visas, are nonimmigrant visas for persons who want to enter the United States temporarily - for tourism, pleasure or visiting. The B-2 visitor or

tourist visa is a nonimmigrant visitor visa issued by the DOS. It is issued for tourism or medical treatment purposes only. A nonimmigrant visa is intended for a citizen of a foreign country to enter the United States for a temporary stay. There are some activities which are prohibited for B-2 visa recipients. One of these prohibited activities is employment. A B-2 visa holder is not permitted to work while in the United States.

18. As part of the B-2 nonimmigrant visa application process, applicants complete the Form DS-160, Online Nonimmigrant Visa Application with the DOS. Form DS-160 is submitted electronically to the DOS website via the internet. Consular Officers use the information entered on the DS-160 to process the visa application and, combined with a personal interview, determine an applicant's eligibility for a nonimmigrant visa. Applicants certify with their electronic signature that the applicant has read and understood the questions in the application and that the answers are true and correct. They also certify that all declarations made on the application are unsworn declarations made under the penalty of perjury.

19. United States Citizenship and Immigration Services (USCIS), a component of the DHS, is the government agency that oversees lawful immigration to the United States. USCIS adjudicates the petitions and applications of potential immigrants and is therefore responsible for administrating and regulating the various visa programs, petitions and applications available to aliens desiring to come to or currently in the United States, including the H-2B temporary non-agricultural worker visa, the B-2 temporary visitor for pleasure visa, and the Form I-539 Application to Extend/ Change Nonimmigrant Status.

20. Once DOS approves the B-2 visa, aliens enter the United States via a port-of-entry to the United States and are subject to inspection by U.S. Customs and Border Protection (CBP), part of the DHS. Aliens seeking to lawfully enter into the United States must establish

their admissibility to the satisfaction of the CBP officer. This is done as part of the inspection process. As part of this process, aliens travelling on a nonimmigrant visa complete a Form I-94 Arrival/Departure Record.

21.     A B-2 visa is valid for a certain period of time for a stay in the United States, determined by CBP at entry, but not to exceed six months. In order to extend the authorized stay on a B-2 visa, a Form I-539 Application to Extend/Change Nonimmigrant Status must be filed with and approved by USCIS. Applicants certify under the penalty of perjury with their signature that the applicant has read and understood the questions in the application and that the answers and supporting evidence submitted are true and correct. Some of the material questions in the Form I-539 include: address where the applicant will stay, source of economic support during stay, whether the applicant has done anything to violate the terms of their current visa status and whether the applicant has been employed in the United States.

22.     A B-2 visa holder that enters the United States as part of an arrangement to illegally work in the United States has violated the terms of his or her B-2 visa and is not eligible to enter and/or remain in the United States.

C.      RASKO's Efforts to Employ B-2 Visa Holders in the United States

23.     From at least 2007 through the date of the Indictment, RASKO recruited foreign nationals from Israel to work as employees in its kiosks and stores in malls in the United States. If prospective employees did not have a visa, RASKO personnel offered to assist individuals in obtaining one for travel to the United States. Since 2011, many such workers came to the United States via B-2 visitor visas.

24.     Prior to in or about 2011, RASKO utilized the H-2B visa program, which authorized the employment of temporary workers from foreign countries under certain

conditions and after application to certain government agencies. During this time, RASKO engaged in some reporting of wages and workers to the Internal Revenue Service and state employment agencies, as well as applying for and reporting such workers to the Department of Labor (DOL), Department of State (DOS) and the Department of Homeland Security (DHS).

25.    In or about 2011, RASKO began utilizing primarily B-2 visa holders as its foreign workforce in the United States to the exclusion of the H-2B visa process. As such, RASKO did not disclose its B-2 visa holding foreign workforce to any government agency. From in or about 2011 through in or about the date of this Indictment, RASKO employed over one hundred and forty (140) B-2 visa holders that were not authorized to work in the United States. RASKO did not withhold employment or income taxes from the compensation it provided to its B-2 employees, and did not report B-2 employees to the Internal Revenue Service or state employment agencies. When wages were reported for employees that had a legal status to work in the United States, the reports were, at times, inaccurate.

26.    Following the recruitment of foreign nationals in Israel to work in the United States, RASKO entered into employment contracts with such individuals, whereby RASKO agreed to pay for transportation to and within the United States, assist with travel arrangements, and provide for housing and transportation to and from work in the United States. RASKO also agreed to pay employees on a commission basis for sales conducted in the United States. In certain situations, employees were required to reimburse RASKO for transportation and/or housing via deductions from the employees' pay.

27.    Prior to an employee's arrival in the United States, RASKO personnel in Israel sent via e-mail certain documents and information related to the pending arrival, including, at times, a biographical summary, travel itinerary, and the aforementioned employment contract.

Such emails were sent to and circulated amongst various RASKO managers, including GUR, KATZ, BEN CNAAN, GENISH and/or SASON. In certain situations, employees were provided with addresses to use on their Form I-94 Arrival/Departure records and briefed on dealing with the CBP inspection process.

28. RASKO managers, including GUR, GENISH and/or SASON, contracted with apartment complexes in Virginia, Georgia, Pennsylvania and New Jersey in order to obtain apartments for its foreign workers. Managers assigned RASKO employees to particular apartments and maintained employee housing lists. Housing and automobile transportation were supervised by the respective area managers. Employee housing lists were compiled by RASKO Israeli personnel and circulated via email amongst the various managers, including GUR, KATZ, BEN CNAAN, GENISH and/or SASON.

29. In violation of their B-2 visitor visa status, RASKO employees traveled to the United States and worked at the various kiosks in malls in Virginia (including Patrick Henry Mall in Newport News, Virginia), Pennsylvania, New Jersey, Maryland, and Georgia. RASKO employees on occasion received paystubs, but were primarily compensated via cash or gift cards. A number of employees also received wire transfers to personal bank accounts in Israel and within the United States. RASKO relied on its Israeli work force to market its Dead Sea based products in the United States.

30. RASKO operated a Facebook page, that serviced STANGA, GAYA and VENUS (represented as "Rasko Virginia Beach," "Rasko Atlanta," and "Rasko Philadelphia") on which company updates and recruiting messages, as well as employee photographs and sales milestones were displayed. The Facebook page was also utilized to communicate with potential and current RASKO employees through the messenger function.

31. RASKO conducted an annual company convention in Las Vegas, Nevada, and transported its employees (making and paying for travel arrangements and flights) from the various regions and celebrating as one company, with several managers making speeches and leading employees around casinos and hotels and sponsoring activities. Photographs and videos from these trips were posted to the RASKO Facebook page.

32. Once in the United States and working for RASKO, the managers and other employees assisted certain employees holding B-2 visas to apply for and obtain (and in some cases pay for) an extension of stay on their B-2 visas, which permitted employees to stay longer in the United States. In seeking such extensions, employees did not reveal their employment with RASKO. Managers provided employees with several versions of a form letter to use in support of their requested extension, which falsely claimed that the employee wanted to remain in the United States to travel and/or visit with friends and family.

33. From in or about 2012 through in or about at least 2014, RASKO maintained bank accounts with Bank of America in the names of STANGA, VENUS, and GAYA. These accounts were utilized to take in revenue from the sales at RASKO kiosks and stores in several states, including Pennsylvania, Georgia, and Virginia. The accounts were also utilized to pay for the rental payments for apartments, mall kiosks and store locations, airline flights, hotels, local transportation costs, salary payments and wire transfers to employees, visa processing costs, recruiting costs, utility payments for apartment locations, point of sale software and other associated business costs.

34. There were two STANGA checking accounts, *1763 and *1776, which were opened in Durham, North Carolina on or about December 31, 2007, by GUR and KATZ. BEN

CNAAN was added to the *1776 account and received a business debit card on or about March 11, 2013 in Virginia.

35.     There were two VENUS checking accounts, *1919 and *9682, which were opened in West Norriton, Pennsylvania on or about March 13, 2012, by GENISH, and a business debit card was issued for S.V. for *1919. On or about March 21, 2012, GUR was added to both VENUS accounts.

36.     There were two GAYA checking accounts, *1143 and *6675, which were opened in Raleigh, North Carolina by SASON and GUR on or about February 15, 2013, and February 25, 2013 respectively.

37.     From in or about 2012 through in or about 2014, RASKO accounts with Bank of America took in approximately $14,110,853.66 through merchant services accounts and credit card processing accounts for sales occurring at RASKO's various kiosks and stores. Additionally, RASKO took in approximately $407,298.36 in personal checks at the stores and kiosks.

38.     From in or about 2012 through in or about at least 2014, apartments were leased for employees and managers in Virginia, Pennsylvania, Georgia, and at times, New Jersey. The apartments were leased in the regional company names - STANGA, VENUS, or GAYA - and the respective regional manager, BEN CNAAN, GENISH, or SASON, along with GUR, served as the contact person. Regional managers resided in the leased apartment complexes, at times hosting regional meetings, training sessions, and parties at the complexes. Approximately $648,923.80 from the RASKO Bank of America accounts was spent on rent for employee housing at these apartments.

39.     From in or about 2012 through in about 2014, RASKO paid utility bills for its leased apartments in Virginia, Pennsylvania, Georgia, and at times, New Jersey. These bills included water, electricity, telephones, internet, cable, and other utilities.

40.     From in or about 2012 through in or about at least 2014, RASKO leased mall kiosk and store locations in Virginia, Pennsylvania, Maryland, New Jersey, and Georgia. STANGA, VENUS, or GAYA served as the entity name for these arrangements. Managers BEN CNAAN, GENISH, SASON, and/or GUR served as the owner or contact person. GUR maintained contact with all of the malls. RASKO management communicated with the mall management regularly via email regarding lease agreements, day to day operations, sales reports, and complaints. Approximately $1,495,100.89 from the RASKO Bank of America accounts was spent on rent for kiosk and store locations at malls.

41.     From in or about 2012 through in or about 2014, STANGA, VENUS, and GAYA owned and registered several vehicles in Virginia, Pennsylvania, New Jersey, and Georgia. These vehicles were owned and registered in the entity names and registered to the residential addresses at the leased RASKO apartment complexes. RASKO bank and/or credit card accounts purchased the vehicles and paid for the vehicle registrations, maintenance, and fuel costs.

42.     From in or about 2012 through in or about 2014, RASKO utilized a travel agency known as TRAVEX, LTD, based in Israel. GUR, KATZ, and other RASKO employees and/or managers communicated via email regularly with this travel agency regarding airline reservations for employees and/or themselves. This travel agency assisted with making international airline reservations for employees to and from the United States.

43.     From in or about 2012 through in or about 2014, international wire transfers were made from the RASKO bank accounts to an account held at Israel Discount Bank, known as

R.Magedon Inc. Transfers were made from STANGA, VENUS, and GAYA accounts. In total, approximately $548,555.00 in international wires was transferred from RASKO Bank of America accounts to the R.Magedon Inc., account at Israel Discount Bank.

44.     From in or about 2012 through in or about 2014, domestic and international wire transfers were sent from RASKO accounts to numerous bank accounts name of known RASKO employees. Additionally, checks were written by GUR, GENISH, SASON, and BEN CNAAN to known RASKO employees. Transfers were sent and checks written from STANGA, VENUS, and GAYA accounts. In total, approximately $2,083,638.89 in wires, transfers, and checks were paid from RASKO Bank of America accounts to RASKO employees. At least $887,319.14 was paid to known B-2 employees.

45.     From in or about 2012 through in or about 2014, domestic and international bank and wire transfers were sent from RASKO accounts to numerous bank accounts in GUR and/or KATZ's names or associated businesses. Transfers were sent and checks written from STANGA, VENUS, and GAYA accounts. In total, approximately $362,315.00 in wires, transfers, and checks were paid from RASKO Bank of America accounts to GUR, KATZ, and/or associated businesses.

46.     In addition to the Bank of America accounts, RASKO had Business Platinum credit card accounts for STANGA with American Express. Credit cards were issued in the names of BEN CNAAN, GUR, KATZ, and other RASKO employees. The cards were utilized for travel costs, gasoline, groceries, parking, business insurance, cosmetics products and other costs. Approximately $729,702.23 was spent on the American Express accounts from the STANGA *1763 Bank of America account.

<u>COUNT ONE</u>

THE GRAND JURY CHARGES THAT:

1.    The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.    Beginning on a date unknown to the Grand Jury, but believed to be in or about at least 2011, and continuing until in or about the time of the Indictment, the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and elsewhere, OMER GUR, also known as "Omer Gur Geiger," BOAZ BEN CNAAN, SHLOMO GENISH, ZION SASON, also known as "Zion Sasson," EYAL KATZ, RITA BERKOVICH, IDO RODES, GUY MAZON, SHIMON MIZRAHI and SHAI YONA, also known as "Shay Yona," the defendants herein, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, and agree with each other and others known and unknown to the Grand Jury, to:

a. defraud the United States of America concerning one or more of its lawful government functions and rights hereafter described, that is;

aa. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of the DOL to administer, regulate and enforce the regulations and laws relating to the implementation of the H-2B non-immigrant visa program;

bb. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DHS to administer, regulate and enforce the regulations and laws related to the hiring, employment and presence of aliens in nonimmigrant status and immigrant status in the United States;

cc. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DOS to administer, regulate and enforce the regulations and laws related to the application, processing, and approval of visas in the United States;

dd. To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of DHS to regulate and enforce violations, regulations and laws relating to transporting, harboring and encouraging and inducing illegal aliens;

b. commit one or more of the following offenses, that is:

aa. To make under oath, and as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, and to knowingly subscribe as true, false statements with respect to a material fact in applications, affidavits and other documents required by the immigration laws and regulations prescribed thereunder, and to knowingly present such applications, affidavits and other documents containing false statements, in violation of Title 18, United States Code, Section 1546(a);

bb. To encourage and induce aliens to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv);

cc. To conceal, harbor and shield from detection aliens in buildings and other places for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l )(A)(iii);

dd. To transport and move aliens within the United States by means of transportation and otherwise in furtherance of such violation of law for the purpose of

15

commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(ii); and

ee.     To knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, affecting a financial institution, for which the defendant and co-conspirators knowingly caused to be placed in a post office, in an authorized depository for mail matter to be sent and delivered by the Postal Service, or caused to be deposited a matter or thing to be sent or delivered by private or commercial interstate carrier according to the direction thereon certain matters and things, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1341.

## WAYS, MANNER AND MEANS OF THE CONSPIRACY

The ways, manner and means by which the foregoing objectives of the conspiracy to defraud the United States and commit offenses against the United States were to be accomplished included, but were not limited to, the following:

3.     The primary purpose of the conspiracy was for the conspirators to illegally induce and recruit, for employment purposes, foreign nationals to enter the United States from Israel on B-2 visitor visas for the purpose of harboring and transporting such visa violators to engage in continued illegal employment that served to provide financial gain and benefit to the conspirators, without meeting and while circumventing and obstructing the lawful requirements of employing foreign nationals imposed by agencies of the United States.

4.     It was a part of the conspiracy that the conspirators would by deceit, craft, trickery and dishonest means, defraud the United States by interfering and obstructing the lawful

government functions of the DOL, DHS, DOS, in that the defendants would recruit Israeli foreign nationals with no lawful employment status in the United States for employment positions in the United States and further act to maintain the foreign nationals' continued presence and employment in the United States through the submission of false and fraudulent B-2 extension applications. In so doing, the conspirators acted to circumvent the H-2B visa process, which would have allowed for legitimate employment by foreign nationals had certain requirements been met.

5. It was further a part of the conspiracy that the conspirators provided airplane tickets and travel itineraries for B-2 visa holders, who were visa violators due to their arranged employment in the United States, to travel to and within the United States for the purpose of employment with the Company.

6. It was further a part of the conspiracy for conspirators and others to provide the visa violators with transportation by automobile or other means upon their arrival in a particular region to the conspirators' places of employment and to the apartment or house where the visa violator would be residing while employed.

7. It was further a part of the conspiracy for conspirators and others to provide housing to the visa violators to whom they had also provided employment. Such housing consisted of apartments that were leased by GUR, GENISH, or SASON in their own name or in the name of STANGA, VENUS, or GAYA. Conspirators would thereafter pay the rent for the residence as well as the utilities.

8. It was further a part of the conspiracy for the conspirators to use its Israeli employees, including, among others, MAZON, BERKOVICH, RODES, MIZRAHI and YONA, to market and sell its Israeli based line of skin care products at kiosk locations.

9. It was further a part of the conspiracy for the conspirators to pay the RASKO employees who were visa violators in cash, goods, including gift cards, or other means without reporting such payments to the appropriate employment or taxing authorities.

10. It was further a part of the conspiracy that conspirators and others would deduct a certain weekly amount from the pay of the employees for living in the housing provided by the Company and for the use of the Company-owned vehicle fleet.

11. It was further a part of the conspiracy that the conspirators would use and cause to be used the United States Postal Service and private and commercial carriers for the purpose of executing a scheme to prepare and submit fictitious B-2 visas extension applications, known as a Forms I-539, to USCIS. The conspirators assisted with the preparation of applications, providing a form letter to be submitted with the application, and at times paying for the cost of the visa extension application fee. If further evidence was requested by USCIS in support of the application, the conspirators would assist with preparation and submission of those materials.

12. It was further a part of the conspiracy that the conspirators fraudulently obtained B-2 visa extensions for RASKO employees that allowed the employees to remain in the United States and obtain money for the Company and the employees through their continued illegal employment.

13. It was further a part of the scheme and artifice to defraud that once the B-2 visa holders arrived in the United States and/or had their B-2 visas extended through fraudulent means, the conspirators employed these workers who were visa violators contrary to the regulations set forth by DOS, DHS, and DOL.

14.     It was further a part of the conspiracy that conspirators and others paid certain B-2 visa holders, who were Company employees and visa violators, larger payments for further distribution to other employees.

## OVERT ACTS

In furtherance of the conspiracy and to bring about the objects and goals of the conspiracy to defraud and to commit offenses against the United States, OMER GUR GEIGER, BOAZ BEN CNAAN, SHLOMO GENISH, ZION SASON, EYAL KATZ, RITA BERKOVICH, IDO RODES, GUY MAZON, SHIMI MIZRAHI and SHAI YONA, the defendants herein, along with other known and unknown co-conspirators committed overt acts in the Eastern District of Virginia, and elsewhere, including but not limited to the following:

1.     On November 7, 2011, RASKO employee A.U. sent a sent a fraudulent visa extension application for B-2 visa holder T.R., to USCIS from Virginia Beach, Virginia, to St. Albans, Vermont, via UPS. The visa extension application stated that T.R. resided in Virginia Beach, Virginia (in an apartment leased by RASKO). T.R. fraudulently stated that she was not employed and provided false information in support of her requested extension, including a version of a form letter used by various RASKO employees in support of their requested B-2 visa extensions.

2.     From on or about January 19, 2012 through on or about January 23, 2012, GUR, GENISH, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada for RASKO employees. GUR purchased airline tickets for travel from RASKO regions to Las Vegas and reserved hotel rooms at the MGM Casino and Hotel in Las Vegas.

3.     On or about February 23, 2012, GUR signed a lease with General Growth Properties for a kiosk location at Park City Mall, Lancaster, Pennsylvania.

4.    On or about May 9, 2012, GUR signed a lease with General Growth Properties for a kiosk location for STANGA at Park City Mall, Lancaster, Pennsylvania.

5.    On or about July 11, 2012, GUR signed a lease with General Growth Properties for a kiosk location for STANGA at Lynnhaven Mall, Virginia Beach, Virginia.

6.    On or about August 10, 2012, RASKO procured airline tickets on Delta Airlines for S.D. and O.D., B-2 visa holders, scheduled to travel to Virginia to work for RASKO. The tickets were scheduled from Tel Aviv, Israel to New York, New York.

7.    On August 31, 2012, GENISH wrote a check from the VENUS Bank of America *1919 account for $2530.16 to Riverview Landing, an apartment complex in Eagleville, Pennsylvania, with the memo line "Apt Rent 6302."

8.    On or about October 2, 2012, RASKO purchased airline tickets on US Airways for S.D. and O.D., B-2 visa holders, scheduled to travel to Virginia to work for RASKO. The tickets were scheduled from New York, New York to Norfolk, Virginia on October 22, 2012.

9.    On or about November 27, 2012, GUR signed a lease with Simon Malls for a kiosk location at The Mall of Georgia, Buford, Georgia. SASON was listed as the contact person.

10.    On November 25, 2012, RASKO personnel in Israel sent an email to GUR containing the biographical summary for an employee, L.G., who was coming to work in the Virginia region. The summary noted that she was an Israeli citizen and had a visa for three months. Within the summary, it was written, "In the event that the Employee shall not be able to complete the 3 [three] months with the Company due to issues with the Immigration Authorities (duration of stay granted, including request for extension of stay), the Employee shall be

reimbursed $300 [three hundred dollars] for the airline ticket." Also on November 25, 2012, GUR forwarded this email to YONA.

11.    On December 19, 2012, Y.A. sent an email to GUR with an attached visa extension letter to USCIS and a Form I-539 (B-2 visa extension application) for D.G., a B-2 visa holder who worked in the Philadelphia, Pennsylvania region, and details regarding other documents submitted with the extension. GUR then forwarded the email with the attachments to YONA, with the message "Case for example."

12.    On December 19, 2012, D.G. a B-2 visa holder who worked for RASKO in the Philadelphia, Pennsylvania region, sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Norristown, Pennsylvania, to St. Albans, Vermont, via UPS. The visa extension application stated that D.G. resided in Norristown, Pennsylvania (in an apartment leased by RASKO). D.G. falsely stated that she was not employed and provided false information in support of his requested extension, including a version of the form letter used by various RASKO employees.

13.    From on or about January 9, 2013 through on or about January 14, 2013, GUR, GENISH, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada for RASKO employees. GUR purchased airline tickets for travel from RASKO regions to Las Vegas and reserved hotel rooms at the MGM Casino and Hotel in Las Vegas.

14.    On January 16, 2013, RASKO personnel in Israel sent an email to GUR and KATZ with the continued employment contracts for MIZRAHI and G.S.

15.    On January 16, 2013, at John F. Kennedy Airport, New York, BEN CNAAN entered the United States via a B-2 visitor visa.   .

16.     On January 18, 2013, MIZRAHI sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to United States Citizen and Immigration Services (USCIS) from Virginia Beach, Virginia, to Laguna Niguel, California via the United States Postal Service (USPS). The visa extension application fraudulently stated that MIZRAHI resided in Resada, California, and that he was not employed and provided false information in support of his requested extension.

17.     On or about January 25, 2013, RASKO personnel in Israel sent an email to GUR and KATZ with a contract attached for BEN CNAAN to start working as the area manager for Virginia. The contract detailed travel, housing, working, and pay arrangements.

18.     On or about January 28, 2013, GUR signed a lease with General Growth Properties for a kiosk location for VENUS at Park City Center mall, Lancaster, Pennsylvania.

19.     On or about February 7, 2013, SASON and S.D., a RASKO employee who had a B-2 visa, worked at a kiosk located at Lynnhaven Mall in Virginia Beach, Virginia.

20.     On or about February 9, 2013, GUR wrote a check from STANGA *1763 Bank of America account to YONA for $3000.00 with the memo line "paycheck." YONA cashed the check on February 11, 2013.

21.     On or about February 11, 2013, GUR wrote a check from STANGA *1763 Bank of America account to YONA for $5000.00 with the memo line "paycheck." YONA cashed the check on February 11, 2013.

22.     On or about February 16, 2013, GUR wrote a check from the STANGA *1763 Bank of America checking account for $5000.00, made out to YONA, who then cashed the check on or about February 19, 2013

23. On February 20, 2013, RASKO procured an airline ticket for MAZON to travel from Tel-Aviv to Norfolk, Virginia on March 4, 2013.

24. On or about February 20, 2013, RASKO procured an airline ticket for T.B.A., a B-2 visa holder coming to work in Virginia, to travel from Tel Aviv, Israel to Norfolk, Virginia on February 28, 2013.

25. On or about February 23, 2013, GUR wrote a check from the STANGA *1763 Bank of America checking account for $6000.00, made out to YONA, who then cashed the check on or about February 23, 2013.

26. On March 1, 2013, RASKO personnel in Israel sent an email to GUR, KATZ and BEN CNAAN containing a biographical summary and travel reservations for MAZON to come to the United States to begin employment. GUR then forwarded this email to YONA.

27. On or about March 2, 2013, GUR wrote a check from the STANGA *1763 Bank of America checking account for $6500.00, made out to YONA, who then cashed the check on or about March 4, 2013. Despite these payments, the Company did not report any wages for YONA to the Virginia Employment Commission.

28. On or about March 13, 2013, RASKO personnel in Israel sent an email to GUR and GENISH containing the biographical summary for an employee, N.D., who was coming to work in the Pennsylvania region. The summary noted that he was an Israeli citizen. Within the biography, it was written, "We financed his visa. He has nothing to return to us." On March 17, 2013, GUR forwarded this email to unindicted co-conspirator S.Y. and an unknown RASKO employee.

29. On April 19, 2013, MIZRAHI , with the assistance of A.U., sent an additional fraudulent visa extension application, signed under penalties of perjury, to USCIS from Virginia

Beach, Virginia, to Louisville, Texas via UPS. The visa extension application falsely stated that MIZRAHI resided in Resada, California and that he was not employed and provided false information in support of his requested extension, including a version of the form letter used by various RASKO employees.

30.     On or about April 24, 2013 RASKO personnel in Israel sent an email to GUR, KATZ and BEN CNAAN containing an interview summary for BERKOVICH, which GUR then forwarded to N.K., an assistant manager in Virginia Beach. On April 24, 2013, GUR and RASKO personnel in Israel engaged in further email correspondence concerning BERKOVICH's travel to the United States.

31.     On numerous dates in 2013, GUR signed checks to N.K., an unindicted co-conspirator who served in an assistant managerial role for RASKO. N.K. was a United States and Israel dual citizen, which allowed him to be employed legally in the United States. On April 19, 2013, a $6000.00 check with the memo line "paycheck" was written and cashed. On April 25, 2013, a $5000.00 check with the memo line "paycheck" was issued and cashed. On May 1, 2013, a $4000.00 check with a blank memo line was written and cashed. On May 12, 2013, a $762.98 check with the memo line "paycheck" was written and cashed. On May 16, 2013, a $6000.00 check was written and cashed. On May 19, 2013, an $8500.00 check was written and cashed. On May 29, 2013, a $7000.00 check was written and cashed. On June 5, 2013, a $7000.00 check was written and cashed. On June 6, 2013, a $762.98 check with the memo line "paycheck" was written and cashed. On June 26, 2013, a $7000.00 check was written and cashed. In total, during the second quarter of 2013, from March through June, N.K. received approximately $52,025.96 in checks from GUR and STANGA.

32.     On or about May 9, 2013, an international wire transfer of $10,000.00 was sent from STANGA *1763 Bank of America account to BEN CNAAN's account at Bank Hapaolim *1730 in Israel.

33.     On June 18, 2013, numerous RASKO employees, including MAZON, YONA and BERKOVICH, walked out of RASKO-leased apartments at Banyan Grove at Towne Center in Virginia Beach, Virginia and got in to RASKO-owned vehicles to transit to various area malls for work at the Company kiosks.

34.     On June 18, 2013, BEN CNAAN and YONA worked at kiosks at Lynnhaven Mall, Virginia Beach, Virginia.

35.     On June 19, 2013, RASKO personnel in Israel sent an email to GUR, KATZ and GENISH concerning a new employee, H.B., who would be coming to work in Pennsylvania and was scheduled to arrive in the United States on June 27, 2013.  The email contained a biographical summary that stated H.B. was Israeli and had a visa, an employment contract discussing her working and commission arrangements, and her flight details.

36.     On June 28, 2013, GUR digitally signed a lease for an apartment unit, 3840 Banyan Grove Lane Apt 104, located at Banyan Grove at Towne Square, Virginia Beach, Virginia.

37.     On or about July 11, 2013, BEN CNAAN sent a fraudulent visa extension application, signed under penalties of perjury (Form I-539), to USCIS from Virginia Beach, Virginia, to St Albans, Vermont via UPS.  The visa extension application falsely stated that BEN CNAAN resided in Port Washington, New York and that he was not employed and provided false information in support of his requested extension, including a version of the form letter used by various RASKO employees.

38. On or about July 22, 2013, an international wire transfer of $10,000.00 was sent from STANGA *1763 Bank of America account to BEN CNAAN's account at Bank Hapaolim *1730 in Israel.

39. On July 24, 2013, RASKO procured an airline ticket for RODES to travel from Tel-Aviv to Norfolk, Virginia on July 30, 2013.

40. On July 25, 2013, RASKO personnel in Israel sent an email to GUR, KATZ and BEN CNAAN containing a biographical summary and travel reservations for RODES to come to the United States to begin employment. On July 28, 2013, GUR then forwarded this email to N.K., an assistant manager in Virginia Beach.

41. On July 28, 2013, GUR sent an email to RODES containing the address 576 North Birdneck Road, #202, Virginia Beach, Virginia. This address is for a private mailbox at a UPS Store. On July 30, 2013, RODES entered the United States and claimed to reside at the 576 North Birdneck Road #202 address on his arrival/departure record.

42. On August 20, 2013, RASKO procured a ticket on Delta Airlines from Tel Aviv, Israel to New York, New York for R.K., a B-2 visa holder scheduled to come work for RASKO in the Philadelphia region. RASKO also reserved a ticket for her mother, which was never used and later cancelled.

43. On August 26, 2013, MAZON sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Virginia Beach, Virginia, to St. Albans, Vermont, via UPS. The visa extension application falsely stated that MAZON resided in Staten Island, New York and that he was not employed and provided false information in support of his requested extension, including a version of the form letter used by various RASKO employees.

44. On or about September 5, 2013, GUR signed a lease with General Growth Properties for a kiosk location for GAYA at Perimeter Mall, Atlanta, Georgia.

45. On September 10, 2013, GUR sent an email to GENISH with an attached form visa extension letter for MAZON.

46. On September 10, 2013, N.D., a B-2 visa holder working for RASKO in the Philadelphia region, sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Norristown, Pennsylvania, to St. Albans, Vermont, via UPS. The visa extension application falsely stated that N.D. resided in Philadelphia, Pennsylvania and that he was not employed and provided false information in support of his requested extension, including a version of the form letter used by various RASKO employees.

47. On or about September 30, 2013, RASKO personnel in ISRAEL sent an employee housing list to GUR and KATZ, which GUR then forwarded to GENISH.

48. On or about September 30, 2013, GENISH signed a lease with General Growth Properties for a kiosk location for VENUS at Park City Center mall, Lancaster, Pennsylvania.

49. On or about October 1, 2013, RASKO personnel in Israel sent an email to GUR, KATZ, and SASON regarding an employee, K.O., who was scheduled to arrive in the United States on October 8, 2013 to work in Atlanta, Georgia. Included in the email were a biographical summary, which referenced her being an Israeli citizen and having a visa. In addition, flight arrangements were attached that RASKO reserved via TRAVEX with Delta Airlines on October 1, 2013.

50. On or about October 5, 2013, RASKO personnel in Israel sent an email to GUR, KATZ, and SASON regarding an employee, Y.K., who was coming to work in Atlanta, Georgia as the logistics manager (assistant manager). Included in the email were a biographical

summary, employment contract, and airline flight details. The summary referenced Y.K. being a dual citizen of Israel and the United States and that he was referred for employment with RASKO by YONA. His gross salary would start at $655.00 per week, increasing to $805.00 per week. The summary went on to state: "Since [Y.K.] is a U.S. citizen, he will receive an American pay stub beginning 1 Nov. 2013. The amount of the pay stub will be determined by both parties in the US." Beginning November 1, 2013, and continuing on a monthly basis through 2014, Y.K. received GAYA paychecks signed by SASON of approximately $733.23 per month (month 1 = $800.52, month 2 = $732.81, the remainder = $733.23), but no GAYA paychecks were issued for the $655 or $805 weekly salary as dictated in the summary and/or contract.

51. On October 8, 2013, RODES and MIZRAHI worked at a RASKO-leased kiosk at MacArthur Center mall in Norfolk, Virginia.

52. On October 8, 2013, BEN CNAAN worked at a RASKO-leased kiosk at Lynnhaven Mall in Virginia Beach, Virginia.

53. On or about October 12, 2013, BEN-CNAAN sent an email to individuals including GUR and KATZ regarding the employee sales of MAZON and RODES.

54. On or about October 13, 2013, RASKO personnel in Israel sent an email to GUR, KATZ, and SASON regarding an employee, L.I., who was scheduled to arrive in the United States on October 16, 2013 to work in Atlanta, Georgia. Included in the email were a biographical summary, which referenced her being an Israeli citizen and having a visa. The biographical summary contained the note: "She is apprehensive about the legality issue, but we calmed her down. You too, you should talk to her about that issue." In addition, an employment contract and flight arrangements were attached.

55.     On or about October 15, 2013, RASKO personnel in ISRAEL sent an employee housing list to GUR and KATZ.

56.     On October 17, 2013, YONA sent an email to GUR with the attached signed visa extension application of BERKOVICH, using the RASKO Virginia Beach office as BERKOVICH's claimed residence, falsely claiming that BERKOVICH did not work and containing a version of the form letter used by other RASKO employees. BERKOVICH at that time lived in the RASKO-leased apartments at Banyan Grove at Towne Center, Virginia Beach, Virginia and worked at the RASKO kiosks. Additional email correspondence regarding this extension occurred between GUR and YONA on November 3, 2013.

57.     On October 20, 2013, GUR arranged for an airline ticket for BERKOVICH to depart the United States.

58.     On October 20, 2013, GUR rented a hotel room for MAZON in Virginia Beach, Virginia.

59.     On or about December 4, 2013, GUR completed an application and credit references for apartment units to be leased in the name of VENUS at Bentley Ridge apartment complex in Lancaster, Pennsylvania.

60.     On or about December 10, 2013, GENISH sent an email to K.E., an employee at High Associates, Bentley Ridge apartment complex in Lancaster, Pennsylvania from his personal email account. He identified himself as GUR's business partner and provided a rental reference, utilizing Riverview Landing Apartments in Eagleville, Pennsylvania. He stated that GUR and he had been working with Riverview Landing for the prior three and a half years.

61.     On December 10, 2013, an international wire transfer of $2000.00 was sent from VENUS *1919 to an account registered to H.B., a RASKO employee with a B-2 visa, at Bank Hapoalim, based in Israel.

62.     On or about January 7, 2014, GUR signed a lease with General Growth Properties for a kiosk location for GAYA at Cumberland Mall, Atlanta, Georgia.

63.     On or about January 7, 2014, GUR signed a lease with General Growth Properties for a kiosk location for GAYA at Perimeter Mall, Atlanta, Georgia.

64.     From on or about January 16, 2014 through on or about January 20, 2014, GUR, GENISH, BEN CNAAN, SASON, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada.   GUR purchased airline tickets for employees to travel from RASKO regions to Las Vegas and reserved hotel rooms at the MGM Casino and Hotel in Las Vegas. RASKO purchased tickets to a Cirque-du-soleil at the Mirage Casino and tickets for a buffet meal at the Bellagio.

65.     On or about January 21, 2014, RODES sent his B-2 visa extension application (Form I-539) to USCIS falsely claiming the RASKO Virginia Beach office as RODES's claimed residence, falsely claiming that RODES did not work and containing a version of the form letter used by other RASKO employees.   RODES at that time lived in the RASKO leased Virginia Beach apartments at Banyan Grove and worked at the RASKO kiosks.

66.     On or about January 22, 2014, GENISH signed a lease for an apartment unit at 946 Bentley Ridge Boulevard, Lancaster, Pennsylvania, located at the Bentley Ridge apartment complex.   The lease was made in the name of VENUS and GUR was added as a person authorized to have a key and have access to the apartment.   The lease was for the period February 12, 2014 through February 12, 2015 at the rental rate of $1345.00 per month.

67.     On or about January 28, 2014, BEN CNAAN worked at a RASKO-leased kiosk at Patrick Henry Mall, Newport News, Virginia.

68.     On numerous dates in 2014, SASON signed checks from the GAYA *1143 Bank of America checking account to H.C., who was employed legally in the United States. On January 15, 2014, a $1103.00 check was written and deposited and a $4000.00 check was written and cashed. On February 1, 2014, a $4000.00 check was written and cashed. On February 2, 2014, a $2124.00 check was written and was either cashed or deposited. On February 10, 2014, a $9500.00 check was written and cashed. On March 6, 2014, a $7251.00 check was written and cashed. On March 9, 2014, a $4118.00 check was written and cashed. On March 22, 2014, a $3000.00 check was written and cashed. On March 23, 2014, a $3802.00 check was written and cashed. On March 31, 2014, an $8000.00 check was written and cashed. In total, during the first quarter of 2014, from January through March, H.C. received approximately $46,898.00 in checks from SASON and GAYA.

69.     On or about February 20, 2014, GENISH sent an email to K.E., an employee with High Associates, Bentley Ridge Apartments, Lancaster, Pennsylvania, which contained a housing assignment list. The list stated the leased apartment units and which individuals were assigned to each unit. The list included several RASKO employees who had no legal status to work in the United States, including several B-2 visa holders.

70.     On or about March 19, 2014, K.O., a B-2 visa holder working for RASKO in the Atlanta region, sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Buford, Georgia, to St. Albans, Vermont, via UPS. The visa extension application stated that K.O. resided in Buford, Georgia (in apartments leased by RASKO) and falsely stated that she was not employed and provided false information in support

of her requested extension, including a version of the form letter used by various RASKO employees.

71.     On or about March 20, 2014, MIZRAHI and E.P., a B-2 visa holder, worked at a RASKO-leased kiosk at MacArthur Center mall in Norfolk, Virginia.

72.     On or about April 1, 2014, MIZRAHI and T.A., a B-2 visa holder, worked at a RASKO-leased kiosk at MacArthur Center mall in Norfolk, Virginia.

73.     On or about April 25, 2014 MIZRAHI and A.B.H., a B-2 visa holder, worked at a RASKO-leased kiosk at Patrick Henry Mall in Newport News, Virginia.  On the same day, BERKOVICH worked at RASKO-leased kiosk at Lynnhaven Mall in Virginia Beach, Virginia.

74.     On or about April 28, 2014, BERKOVICH worked at a RASKO-leased kiosk at MacArthur Mall, in Norfolk, Virginia.

75.     On or about May 9, 2014, Y.T. and A.B.H., B-2 visa holders, worked at a RASKO-leased kiosk at Patrick Henry Mall in Newport News, Virginia.

76.     On or about June 3, 2014, B.R., a B-2 visa holder, and N.B., a US citizen, worked at a RASKO-leased kiosk at King of Prussia Mall in King of Prussia, Pennsylvania.

77.     On or about June 8, 2014, GUR signed a lease with General Growth Properties for a kiosk location for GAYA at Cumberland Mall, Atlanta, Georgia.

78.     Between on or about July 4, 2014 through July 26, 2014, GUR communicated via email with Y.K., regarding a sample letter, which had been submitted by MAZON to USCIS previously, to be used in response to a Request for Evidence for K.O.'s B-2 visa extension application. GUR provided instructions on how to change the letter.

79.     On or about July 8, 2014, GENISH purchased an airline ticket for MAZON to travel from Harrisburg, Pennsylvania to Denver, Colorado.

80.     On or about July 22, 2014, GENISH purchased an airline ticket for MAZON to travel from Denver, Colorado to Las Vegas, Nevada

81.     On or about July 28, 2014, K.O., a B-2 visa holder working for RASKO in the Atlanta region, sent a response for a Request for Evidence to pertaining to her previously submitted fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Atlanta, Georgia, to St. Albans, Vermont, via UPS. The supporting documents submitted included the letter circulated between GUR and Y.K., with the additions that GUR directed. Within the letter, K.O. fraudulently states that she is staying with friends during her stay in the United States. She also changed her mailing address to a new apartment location in Atlanta, Georgia (leased by RASKO).

82.     On or about July 29, 2014, GUR purchased an airline ticket for BERKOVICH to travel from Norfolk, Virginia to Miami, Florida on August 4, 2014.

83.     On or about August 8, 2014, SASON submitted a financial responsibility letter to Mt. Vernon Flats at the Perimeter apartment complex in Atlanta, Georgia for unit 904 Potomac Road. The letter, typed on GAYA letterhead, read "Gaya Enterprise will be financially responsible for any and all costs incurred for all of our apartments." SASON signed and dated the letter.

84.     On or about September 22, 2014, an international wire transfer of $5000.00 was sent from GAYA *1143 Bank of America account to RODES' account at Bank Hapaolim *6800 in Israel.

85.     On October 6, 2014, MAZON worked at a RASKO kiosk at King of Prussia Mall, in Pennsylvania.

86.     On October 8, 2014, K.O., a B-2 visa holder working for RASKO in the Atlanta region, sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Atlanta, Georgia, to St. Albans, Vermont, via UPS.  The visa extension application falsely stated that K.O. resided in Atlanta, Georgia at an address that is actually the address of the UPS store, that she was not employed and provided false information in support of her requested extension, including a version of the form letter used by various RASKO employees.

87.     On December 8, 2014, RODES, a B-2 visa holder working for RASKO in the Atlanta region, sent a fraudulent visa extension application, signed under penalties of perjury, (Form I-539) to USCIS from Dunwoody, Georgia, to St. Albans, Vermont, via UPS.  The visa extension application falsely stated that RODES resided in Atlanta, Georgia at an address that is actually the address of the UPS store, that he was not employed and provided false information in support of he requested extension, including a version of the form letter used by various RASKO employees.

88.     On or about December 10, 2014, an international wire transfer of $3610.00 was sent from GAYA *1143 Bank of America account to RODES' account at Bank Hapaolim *6800 in Israel.

89.     From on or about January 14, 2015 through on or about January 18, 2015, GUR, GENISH, BEN CNAAN, SASON, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada.  GUR purchased airline tickets for employees to travel from RASKO regions to Las Vegas and reserved hotel rooms at the Palazzo Casino and Hotel in Las Vegas, Nevada.

34

90.     On or about January 26, 2015, GUR signed a lease with Simon Malls for a kiosk at The Mall of Georgia, Buford, Georgia for GAYA. SASON was listed as the contact person.

91.     On or about January 30, 2015, GUR signed a lease with General Growth Properties for a kiosk at Perimeter Mall, Atlanta, Georgia for GAYA.

92.     On or about April 8, 2015, GUR signed a lease with General Growth Properties for a kiosk at Perimeter Mall, Atlanta, Georgia for GAYA.

93.     On or about August 13, 2015, SASON signed a lease for 2003 Potomac Road, Atlanta, Georgia, a unit located in the Mt Vernon Flats at the Perimeter apartment complex. The unit was registered in GAYA's name. The lease period was from September 1, 2015 through August 31, 2016 and the monthly rental rate was $1758.00.

94.     On or about December 29, 2015, BERKOVICH worked at a RASKO kiosk at Lynnhaven Mall, Virginia Beach, Virginia.

95.     From on or about January 11, 2016 through on or about January 14, 2016, GUR, GENISH, BEN CNAAN, SASON, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada. GUR purchased airline tickets for employees to travel from RASKO regions to Las Vegas and reserved hotel rooms at the Venetian Casino and Hotel in Las Vegas, Nevada. GUR, GENISH, BEN CNAAN, SASON, and other conspirators sponsored a RASKO awards ceremony and celebration at the Palazzo Casino and Hotel.

(All in violation of Title 18,United States Code, Section 371.)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The factual allegations contained in the General Allegations are incorporated herein by reference as if set out in full.

2.      On or about the dates specified below, in the Eastern District of Virginia and elsewhere, OMER GUR, also known as "Omer Gur Geiger", BOAZ BEN CNAAN, SHLOMO GENISH, RITA BERKOVICH, EYAL KATZ, IDO RODES, GUY MAZON, SHIMON MIZRAHI and SHAI YONA, also known as "Shay Yona," the defendants herein, aided and abetted by others and along with other conspirators known and unknown to the Grand Jury, did knowingly make under oath, and as permitted under penalty of perjury under Title 28, United States Code, Section 1746, did knowingly subscribe as true, false statements with respect to one or more material facts in applications, affidavits or other documents required by the immigration laws of the United States and regulations prescribed thereunder, and did knowingly present such applications, affidavits and other documents containing false statements, that is:

| Count | Defendant(s) | Date (on or about) | Description of False Statement |
|-------|-------------|--------------------|-------------------------------|
| 2 | YONA, GUR | 1/3/2013 | YONA answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of status" and provided false follow up response form letter to question 3g. |
| 3 | MIZRAHI, GUR, KATZ, YONA | 4/19/2013 | MIZRAHI answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of status" and provided false follow up response form letter to question 3g. |
| 4 | BEN CNAAN, GUR, YONA | 7/11/2013 | BEN CNAAN answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of |

| | | | |
|---|---|---|---|
| | | | status" and provided false follow up response form letter to question 3g. |
| 5 | MAZON, GUR, YONA, GENISH | 8/26/2013 | MAZON answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of status" and provided false follow up response form letter to question 3g. |
| 6 | YONA, GUR | 10/18/2013 | YONA answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of status" and provided false follow up response form letter to question 3g. |
| 7 | BERKOVICH, GUR | 10/18/2013 | BERKOVICH answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of status" and provided false follow up response form letter to question 3g. |
| 8 | RODES, GUR | 1/21/2014 | RODES answered "no" to question 3g (pg 2 of I-539) "Have you or any other person included in this application been employed in the United States since last admitted or granted an extension or change of status" and provided false follow up response form letter to question 3g. |

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

## COUNTS NINE THROUGH FOURTEEN

THE GRAND JURY FURTHER CHARGES THAT:

1.     The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.     On or about the dates listed below, in the Eastern District of Virginia and elsewhere, OMER GUR, also known as "Omer Gur Geiger," BOAZ BEN CNAAN, EYAL KATZ, and SHAI YONA, also known as "Shay Yona," the defendants herein, aided and abetted by others, and along with other conspirators known and unknown to the Grand Jury, did encourage and induce certain aliens identified in the following Counts to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law:

| Count | Defendant(s) | Date (on or about) | Alien Induced/Encouraged |
|-------|--------------|--------------------|--------------------------|
| 9 | GUR, KATZ, YONA | 10/18/2012 | O.D. |
| 10 | GUR, KATZ BEN CNAAN, YONA | 2/26/2013 | T.B.A. |
| 11 | GUR, KATZ BEN CNAAN, | 3/30/2013 | A.T. |
| 12 | GUR, KATZ BEN CNAAN, | 7/25/2013 | I.R. |
| 13 | GUR, KATZ BEN CNAAN, | 8/14/2013 | D.R. |
| 14 | GUR, BEN CNAAN, KATZ | 10/8/2013 | M.L. |

(In violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv) and Title 18, United States Code, Section 2.)

## COUNTS FIFTEEN THROUGH TWENTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

1.      The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.      On or about the following date ranges, in the Eastern District of Virginia and elsewhere, OMER GUR, also known as "Omer Gur Geiger," BOAZ BEN CNAAN, EYAL KATZ, and SHAI YONA, also known as "Shay Yona," the defendants herein, listed in the counts below, aided and abetted by others, and along with other conspirators known and unknown to the Grand Jury, knowing and in reckless disregard of the fact that the following aliens had come to, entered and remained in the United States in violation of law, did conceal, harbor and shield and did attempt to conceal, harbor and shield from detection such aliens in buildings and other places and by means of transportation for the purpose of commercial advantage and private financial gain:

| Count | Defendant(s) | Dates (on or about) | Alien Harbored |
|-------|-------------|---------------------|----------------|
| 15 | GUR, KATZ, BEN CNAAN, | Sept. – Nov. 2013 | I.R. |
| 16 | GUR, KATZ, BEN CNAAN, YONA | Sept. – Nov. 2013 | R.B. |
| 17 | GUR, KATZ, BEN CNAAN, YONA | Sept. – Nov. 2013 | G.M. |
| 18 | GUR, KATZ, BEN CNAAN, YONA | Sept. – Nov. 2013 | S.M. |
| 19 | GUR, KATZ, BEN CNAAN, YONA | Sept. – Nov. 2013 | T.B.A. |

| | | | |
|---|---|---|---|
| 20 | GUR, KATZ, BEN CNAAN | Sept. – Nov. 2013 | D.R. |
| 21 | GUR, KATZ, BEN CNAAN | Sept. – Nov. 2013 | Y.T. |

(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii) and Title 18, United States Code, Section 2).

THE GRAND JURY FURTHER CHARGES THAT:

1.      The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.      On or about the following dates and in the manner set forth below, in the Eastern District of Virginia and elsewhere, OMER GUR, also known as "Omer Gur Geiger," BOAZ BEN CNAAN and SHAI YONA, also known as "Shay Yona," the defendants herein, knowing and in reckless disregard of the fact that the following aliens had come to, entered and remained in the United States in violation of law, did transport and move such aliens within the United States by means of transportation and otherwise in furtherance of such violation of law, for the purpose of commercial advantage and private financial gain.

| Count | Defendant(s) | Date (on or about) | Alien Transported |
|-------|-------------|--------------------|-------------------|
| 22 | GUR | 10/22/2012 | O.D. |
| 23 | GUR | 6/18/2013 | G.M. |
| 24 | GUR | 6/18/2013 | T.B. |
| 25 | GUR | 6/18/2013 | R.B. |
| 26 | GUR, YONA | 10/11/2013 | S.M. |
| 27 | GUR, YONA | 10/11/2013 | G.M. |
| 28 | GUR, YONA | 10/11/2013 | I.R. |
| 29 | GUR, BEN CNAAN | 1/20/2014 | I.R. |
| 30 | GUR, BEN CNAAN | 1/20/2014 | T.B.A. |
| 31 | GUR, BEN CNAAN | 1/20/2014 | M.L. |
| 32 | GUR, BEN CNAAN | 1/20/2014 | S.M. |

| 33 | GUR, BEN CNAAN | 1/20/2014 | D.R. (Dana Raz) |
|----|----------------|-----------|-----------------|

(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii), and Title 18, United States Code, Section 2).

## COUNT THIRTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

1.     The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.     Beginning on a date unknown to the Grand Jury, but believed to be in or about at least 2011, and continuing until in or about the time of the Indictment, in the Eastern District of Virginia and elsewhere, OMER GUR, also known as "Omer Gur Geiger," BOAZ BEN CNAAN, SHLOMO GENISH, and ZION SASON, also known as "Zion Sasson," and EYAL KATZ, the defendants herein, along with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a.     To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is conspiracy to commit offenses against the United States, constituting acts violating the Immigration and Nationality Act, section 274, for the purpose of financial gain, as set forth in Count One of the Indictment, and violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii); (A)(iii) and (A)(iv), and visa fraud, in violation of Title 18, United States Code, Section 1546; with the intent to promote the carrying on of specified unlawful activity, that is encouraging and inducing illegal entry (8 U.S.C. § 1324(a)(1)(A)(iv)), harboring illegal aliens (8 U.S.C. § 1324(a)(1)(A)(iii)), transporting illegal aliens (8 U.S.C. § 1324(a)(1)(A)(ii)), and visa fraud (8 U.S.C. § 1546), and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented

the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

## OBJECT OF THE CONSPIRACY

The object of the conspiracy was for the co-conspirators to use the proceeds of their conspiracy to defraud and commit offenses against the United States to transport foreign nationals on B-2 visas to the United States for the purpose of those foreign nationals on B-2 visas engaging in work, and to pay, house, and transport those foreign nationals on B-2 visas once they were in the United States.

## WAYS, MANNER AND MEANS OF THE CONSPIRACY

1.      The Ways, Manner, and Means paragraphs 3 through 14, contained in Count One of this Indictment are incorporated herein by reference as if set out in full.

## OVERT ACTS

1.      The Overt Acts paragraphs one through ninety-five contained in Count One of this Indictment are incorporated herein by reference as if set out in full.

(In violation of Title 18, United States Code, Section 1956(h)).

## FORFEITURE ALLEGATION

THE GRAND JURY FURTHER ALLEGES AND FINDS PROBABLE CAUSE THAT:

1. The defendants, if convicted of any of the violations alleged in Counts One through Thirty-Three of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2:

   a. Any property, real or personal, which constitutes, is derived from, or is traceable to the proceeds obtained, directly or indirectly, as a result of the violation;

   b. Any conveyance, including any vessel, vehicle, or aircraft used in the commission of the violation; and

   c. Any property, real or personal, that is used to facilitate, or is intended to be used to facilitate, the commission of the violation.

2. The defendants, if convicted of the violation alleged in Count Thirty-Four of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the violation, or any property traceable to that property.

3. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4. The property subject to forfeiture includes, but is not limited to, the following property:

   a. A monetary judgment in the amount of not less than $14,518,152.02, representing

the proceeds of Counts One through Thirty-Three;

b. Bank of America account number 3830 0758 1919;

c. Bank of America account number 3830 0904 9682;

d. Bank of America account number 2370 0621 1763;

e. Bank of America account number 2370 0621 1776;

f. Bank of America account number 2370 2692 1143;

g. Bank of America account number 2370 2790 6675;

h. Bank of America account number 0006 9726 3072 up to the amount of $210,758;

i. Bank of America account number 2370 1486 1503 up the amount of $197,597;

j. 2007 Silver PT Cruiser VIN 3A8FY68B07T595692;

k. 2005 Red Toyota minivan VIN 5TDZA23C75S326517;

l. 2008 White Suzuki sedan VIN JS2YC414385100438;

m. 2006 Blue Chrysler minivan VIN 1A4GP45R36B681108;

n. 2007 Gold Saturn minivan VIN 5GZDV03137D140357;

o. 2007 Black Kia hatchback VIN KNAFG526177114575;

p. 2011 Grey Audi SUV VIN WA1DKAFP2BA048869;

q. 2002 Toyota Camry VIN JTDBE32K520100723;

r. 2007 Honda Civic LX VIN 1HGFA16507L138678;

s. 2012 Dodge Grand Caravan SXT VIN 2C4RDGCG3CR264269;

t. 2008 Toyota Corolla VIN 1NXBR32E88Z944962;

u. 2010 Chevrolet HHR LS VIN 3GNBAADB2AS523111;

v. 2007 Honda Accord SE VIN 1HGCM56327A228376;

w. 2007 Chevrolet Cobalt LS VIN 1G1AK55F677381338;

x. 2009 Chrysler Town & Country LX VIN 2A8HR44E79R536025;

y. 2008 Nissan Quest VIN 5N1BV28U28N112662;

z. 2009 Hyundai Accent VIN KMHCN46C39U331079;

aa. 2009 Mitsubishi Lancer VIN JA3AU26U09U035804;

bb. 2012 Suzuki SX4 VIN JS2YA5A54C6300865;

cc. 2008 Pontiac G6 VIN 1G2ZF57B184208231;

dd. 2007 Pontiac Grand Prix VIN 2G2WP552X71213585;

ee. 2010 Hyundai Elantra VIN KMHDU4AD1AU085418;

ff. American Express merchant services accounts in the chart below:

| INDN | CO ID |
|------|-------|
| Gaya Enterprises 4104661731 | 1134992250 CCD |
| Gaya Enterprises 4104661699 | 1134992250 CCD |
| Stanga LLC 4452996663 | 1134992250 CCD |
| Seacret Spa 4105061436 | 1134992250 CCD |
| Forever Flawless 4105529804 | 1134992250 CCD |
| Seacret Spa 2192257111 | 1134992250 CCD |
| Seacret Spa 2373490267 | 1134992250 CCD |
| Seacret Spa 4105061402 | 1134992250 CCD |
| Seacret Spa 4105061428 | 1134992250 CCD |
| Forever Flawless 4105371520 | 1134992250 CCD |
| Oro Gold Cosmetics 2374289056 | 1134992250 CCD |
| Seacret Spa 2373490242 | 1134992250 CCD |
| Seacret Spa 2373514611 | 1134992250 CCD |
| Seacret Spa 4105061436 | 1134992250 CCD |

gg. Global Payments merchant services accounts in the chart below:

| DEP ID | INDN | CO ID |
|--------|------|-------|
| 8788290317378 | Venus Enterprise LLC | 5469221406 CCD |
| 8788290317381 | Venus Enterprise LLC | 5469221406 CCD |
| 8788290317383 | Venus Enterprise LLC | 5469221406 CCD |
| 8788290317385 | Venus Enterprise LLC | 5469221406 CCD |

| | | |
|---|---|---|
| 8788290322392 | Stanga LLC | 5469221406 CCD |
| 8788290322394 | Stanga LLC | 5469221406 CCD |
| 8788290327485 | Stanga LLC | 5469221406 CCD |
| 8788290330478 | Stanga LLC | 5469221406 CCD |
| 8788290341250 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290345956 | Stanga LLC | 5469221406 CCD |
| 8788290354072 | Stanga LLC | 5469221406 CCD |
| 8788290356314 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290356316 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290364821 | Venus Enterprise LLC | 5469221406 CCD |
| 8788290365032 | Venus Enterprise LLC | 5469221406 CCD |
| 8788290368327 | Stanga LLC | 5469221406 CCD |
| 8788290369755 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290369894 | Venus Enterprise LLC | 5469221406 CCD |
| 8788290377004 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290382436 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290402561 | Gaya Enterprise LLC | 5469221406 CCD |
| 8788290317378 | Seacret Spa 1 | 5469221406 CCD |
| 8788290317381 | Seacret Spa 2 | 5469221406 CCD |
| 8788290317383 | Seacret Spa 3 | 5469221406 CCD |
| 8788290317385 | Seacret Spa | 5469221406 CCD |
| 8788290322392 | All Thats Natural 1 | 5469221406 CCD |
| 8788290322394 | All Thats Natural 1 | 5469221406 CCD |
| 8788290327485 | Premier Skin Care | 5469221406 CCD |
| 8788290345956 | Premier Skin Care 2 | 5469221406 CCD |
| 8788290356314 | Seacret Spa 1 | 5469221406 CCD |
| 8788290356315 | Seacret Spa 2 | 5469221406 CCD |
| 8788290356316 | Seacret Spa | 5469221406 CCD |
| 8788290364821 | Oro Gold Cosmetics | 5469221406 CCD |
| 8788290368327 | Oro Gold | 5469221406 CCD |
| 8788290369755 | Forever Flawless | 5469221406 CCD |
| 8788290377004 | Forever Flawless | 5469221406 CCD |
| 8788290382436 | Forever Flawless | 5469221406 CCD |
| 8788290402561 | Forever Flawless | 5469221406 CCD |

(In accordance with Title 8, United States Code, Section 1324(b); Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and 982(a)(6)(A); and Title 28, United States Code, Section 2461).

Sealed Pursuant to the
E-Government Act of 2002

UNITED STATES v. OMER GUR, et al., 4:16CR17

A TRUE BILL:

REDACTED COPY

_____

F O R E P E R S O N

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____

Brian J. Samuels
Assistant United States Attorney
Virginia State Bar # 65898
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866

By: _____

Lisa R. McKeel
Assistant United States Attorney
Virginia State Bar # 28652
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866

By: _____

Kevin Hudson
Assistant United States Attorney
Virginia State Bar #81420
Attorney for the United States
721 Lakefront Commons, Suite 300
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866