```
                                FILED
                            IN OPEN COURT

                              JUL - 6 2016

                         CLERK, U.S. DISTRICT COURT
                               NORFOLK, VA
```

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 4:16cr17 |
| ) | |
| OMER GUR, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

If this matter were to proceed to trial, the United States of America would prove beyond a reasonable doubt, by competent and admissible evidence, the following facts:

1. Beginning on a date unknown, but believed to be in or about at least 2011, and continuing until in or about February 2016, OMER GUR, the defendant herein, along with various other individuals did knowingly and willfully combine, conspire, and agree with each other and others, to defraud the United States of America concerning one or more of its lawful government functions and rights and to commit one or more offenses against the United States, including:

   a) to make under oath, and as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, and to knowingly subscribe as true, false statements with respect to a material fact in applications, affidavits and other documents required by the immigration laws and regulations prescribed thereunder, and to knowingly present such applications, affidavits and other documents containing false statements, in violation of Title 18, United States Code, Section 1546(a);

   b) to encourage and induce aliens to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the

1



United States was in violation of law, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv);

  c) to conceal, harbor and shield from detection aliens in buildings and other places for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iii);

  d) to transport and move aliens within the United States by means of transportation and otherwise in furtherance of such violation of law for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(ii); and

  e) to knowingly devise and intend to devise a scheme and artifice to defraud the United States and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to wit, fraudulent immigration documents, for which the defendant and co-conspirators knowingly caused to be placed in a post office, in an authorized depository for mail matter to be sent and delivered by the Postal Service, or caused to be deposited a matter or thing to be sent or delivered by private or commercial interstate carrier according to the direction thereon certain matters and things, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1341.

  2. In or about 2012, federal law enforcement began an investigation into the employment and immigration related practices of a group of business entities, known collectively as RASKO (or referred to herein as "the Company"), and their associated owners and managers, including OMER GUR, the defendant herein. RASKO was in the business of marketing and selling retail cosmetics, with an emphasis on products from the Dead Sea

region of Israel, from kiosk locations in mall-type locations in Virginia, Georgia, Pennsylvania, New Jersey, Missouri, Maryland and North Carolina.

3. RASKO, which was based in Israel, operated in the United States through business entities Stanga, LLC, Venus Enterprise, LLC and Gaya Enterprise, LLC. RASKO was the umbrella company for the aforementioned business entities. These businesses marketed and sold skin care products with an emphasis on products from the Dead Sea region of Israel. These products were sold under several different brand names, including: Seacret Spa, Premier Skincare, Oro Gold, Gratiae, and Déja Vu.

4. OMER GUR, also known as "Omer Gur Geiger" (hereinafter "GUR"), is a Lawful Permanent Resident of the United States who was born in Israel. He first entered the United States via a B-2 visa. At various times from 2004 to the present, he served as the President, Vice President, Registered Agent, Manager, Guarantor, and/or Owner for several related companies, including: Stanga, LLC; Venus Enterprise, LLC; Gaya Enterprise, LLC; ESO Properties, LLC; EMO Properties, LLC; Orion Holdings Group, LLC; Zbang, LLC; R. Magedon, LTD; Rasko, LLC, and Alfa Retail, LLC.

5. Stanga, LLC (hereinafter "STANGA") has been registered in North Carolina, Missouri, Virginia, and New Jersey and operated primarily from Virginia, with GUR as the organizing member. STANGA operated kiosks at malls located in the Hampton Roads region of Virginia. STANGA had an office located on Independence Boulevard in the City of Virginia Beach. From in or about 2013 through March 1, 2016, co-defendant BOAZ BEN CNAAN served as the manager of STANGA's operations. STANGA has two bank accounts with Bank of America, with GUR, BEN CNAAN, and co-defendant EYAL KATZ listed as authorized users.

6. Gaya Enterprise, LLC (hereinafter "GAYA") is registered in North Carolina and Georgia, with co-defendant ZION SASON as its organizing member. GAYA operated kiosks at

3

malls located in the Atlanta, Georgia area. From in or about 2013 through March 1, 2016, SASON served as the manager of GAYA's operations. GAYA has two bank accounts with Bank of America, with GUR and SASON listed as authorized users.

7. Venus Enterprise, LLC, (hereinafter "VENUS") was registered in Pennsylvania, Maryland and New Jersey, with co-defendant SHLOMO GENISH as its organizing member. VENUS operated kiosks at malls located in the Philadelphia area of Pennsylvania, including, at times, New Jersey and Maryland. From in or about at least 2012 to February 2016, GENISH served as the manager for VENUS's operations. VENUS maintained two bank accounts with Bank of America, on which both GENISH and GUR were the authorized users.

8. The investigation determined that from at least 2007 through the date of the Indictment, RASKO recruited foreign nationals from Israel to work as employees in its kiosks and stores in malls in the United States. If prospective employees did not have a visa, RASKO personnel offered to assist individuals in obtaining one for travel to the United States. Since at least 2011, many such workers came to the United States via B-2 visitor visas.

9. A B-2 visa is valid for a certain period of time for a stay in the United States, but not to exceed six months. In order to extend the authorized stay on a B-2 visa, a Form I-539 Application to Extend/Change Nonimmigrant Status must be filed with and approved by United States Customs and Immigration Services. Applicants certify under the penalty of perjury with their signature that the applicant has read and understood the questions in the application and that the answers and supporting evidence submitted are true and correct. Some of the material



questions in the Form I-539 include: address where the applicant will stay, source of economic support during stay, whether the applicant has done anything to violate the terms of their current visa status and whether the applicant has been employed in the United States. An individual who travels to the United States on a B-2 visa with the intent to work has violated the terms of the visa and is not lawfully authorized to be in the United States.

10.   Prior to in or about 2011, RASKO primarily utilized the H-2B and J-1 visa programs, which authorized the employment of temporary workers from foreign countries under certain conditions and after application to certain government agencies. During this time, RASKO engaged in some reporting of wages and workers to the Internal Revenue Service and state employment agencies, as well as applying for and reporting such workers to the Department of Labor (DOL), Department of State (DOS) and the Department of Homeland Security (DHS).

11.   In or about 2011, RASKO began utilizing primarily B-2 visa holders as its foreign workforce in the United States to the exclusion of the H-2B visa process. As such, RASKO did not disclose its B-2 visa holding foreign workforce to any government agency. According to the Government's analysis, from in or about 2011 through in or about February 2016, RASKO employed over one hundred and forty (140) B-2 visa holders that were not authorized to work in the United States. RASKO did not withhold employment or income taxes from the compensation it provided to its B-2 employees, and did not report B-2 employees to the Internal Revenue Service or state employment agencies. Additionally, the B-2 visa employees paid no income taxes on their wages to the Internal Revenue Service.

12.   Following the recruitment of foreign nationals in Israel to work in the United States, RASKO entered into employment contracts with such individuals, whereby RASKO agreed to pay for transportation to and within the United States, assist with travel arrangements,

and provide for housing and transportation to and from work in the United States. RASKO also agreed to pay employees on a commission basis for sales conducted in the United States. In certain situations, employees were required to reimburse RASKO for transportation and/or housing via deductions from the employees' pay.

13. Prior to an employee's arrival in the United States, RASKO personnel in Israel sent via e-mail certain documents and information related to the pending arrival, including, at times, a biographical summary, travel itinerary, and the aforementioned employment contract. Such emails were sent to and circulated amongst various RASKO managers, including the defendant and co-defendants SHLOMO GENISH, EYAL KATZ, BOAZ BEN CNAAN and/or ZION SASON. In certain situations, employees were provided with addresses by GUR to use on their Form I-94 Arrival/Departure records and briefed on dealing with the CBP inspection process.

14. RASKO managers, including the defendant and various conspirators, contracted with apartment complexes in Virginia, Georgia, Pennsylvania and New Jersey in order to obtain apartments for its foreign workers. Managers assigned RASKO employees to particular apartments and maintained employee housing lists. Housing and automobile transportation were supervised by the respective area managers. Employee housing lists were compiled by RASKO Israeli personnel and circulated via email amongst the various managers, including the defendant.

15. In violation of their B-2 visitor visa status, RASKO employees traveled to the United States and worked at the various kiosks in malls in Virginia (including Patrick Henry Mall in Newport News, Virginia), Pennsylvania, New Jersey, Maryland, and Georgia. RASKO employees on occasion received paystubs, but were primarily compensated via cash or gift cards. A number of employees also received wire transfers to personal bank accounts in Israel and

within the United States. RASKO relied on its Israeli work force to market its Dead Sea based products in the United States.

16. Once in the United States and working for RASKO, managers, including the defendant, assisted certain employees holding B-2 visas to apply for and obtain (and in some cases pay for) an extension of stay on their B-2 visas, which permitted employees to stay longer in the United States. In seeking such extensions, employees did not reveal their employment with RASKO. Managers provided employees with several versions of a form letter to use in support of their requested extension, which falsely claimed that the employee wanted to remain in the United States to travel and/or visit with friends and family.

17. The investigation revealed that the primary purpose of the conspiracy was for the conspirators to illegally induce and recruit, for employment purposes, foreign nationals to enter the United States from Israel on B-2 visitor visas, for the purpose of harboring and transporting such visa violators to engage in continued illegal employment that served to provide financial gain and benefit to the conspirators, without meeting and while circumventing and obstructing the lawful requirements of employing foreign nationals imposed by agencies of the United States.

18. The investigation revealed that the conspirators, including the defendant, would use and cause to be used the United States Postal Service and private and commercial carriers for the purpose of executing a scheme to prepare and submit fictitious B-2 visas extension applications, known as a Forms I-539, to USCIS. Other conspirators assisted with the preparation of applications, providing a form letter to be submitted with the application, and at times paying for the cost of the visa extension application fee. If further evidence was requested

by USCIS in support of the application, the conspirators would assist with preparation and submission of those materials.

19. From in or about 2012 through in or about at least 2014, RASKO maintained bank accounts with Bank of America in the names of STANGA, VENUS, and GAYA. These accounts were utilized to take in revenue from the sales at RASKO kiosks and stores in several states, including Pennsylvania, Georgia, and Virginia. The accounts were also utilized to pay for the rental payments for apartments, mall kiosks and store locations, airline flights, hotels, local transportation costs, salary payments and wire transfers to employees, visa processing costs, recruiting costs, utility payments for apartment locations, point of sale software and other associated business costs.

20. There were two STANGA checking accounts, *1763 and *1776, which were opened in Durham, North Carolina on or about December 31, 2007, by GUR and KATZ. BEN CNAAN was added to the *1776 account and received a business debit card on or about March 11, 2013 in Virginia.

21. There were two GAYA checking accounts, *1143 and *6675, which were opened in Raleigh, North Carolina by SASON and GUR on or about February 15, 2013, and February 25, 2013 respectively.

22. There were two VENUS checking accounts, *1919 and *9682, which were opened in West Norriton, Pennsylvania on or about March 13, 2012, by GENISH, and a business debit card was issued for S.V. for *1919. On or about March 21, 2012, GUR was added to both VENUS accounts.

23. From in or about 2012 through in or about 2014, RASKO accounts with Bank of America took in approximately $14,110,853.66 through merchant services accounts and credit card processing accounts for sales occurring at RASKO's various kiosks and

8

stores. Additionally, RASKO took in approximately $407,298.36 in personal checks at the stores and kiosks.

24. From in or about 2012 through in or about at least 2014, apartments were leased for employees and managers in Virginia, Pennsylvania, Georgia, and at times, New Jersey. The apartments were leased in the regional company names - STANGA, VENUS, or GAYA - and the respective regional manager, BEN CNAAN, GENISH, or SASON, along with GUR, served as the contact person. Regional managers resided in the leased apartment complexes, at times hosting regional meetings, training sessions, and parties at the complexes. Approximately $648,923.80 from the RASKO Bank of America accounts was spent on rent for employee housing at these apartments.

25. From in or about 2012 through in about 2014, RASKO paid utility bills for its leased apartments in Virginia, Pennsylvania, Georgia, and at times, New Jersey. These bills included water, electricity, telephones, internet, cable, and other utilities.

26. From in or about 2012 through in or about at least 2014, RASKO leased mall kiosk and store locations in Virginia, Pennsylvania, Maryland, New Jersey, and Georgia. STANGA, VENUS, or GAYA served as the entity name for these arrangements. Managers, including the defendant, served as the owner or contact person. GUR maintained contact with all of the malls. RASKO management communicated with the mall management regularly via email regarding lease agreements, day to day operations, sales reports, and complaints. Approximately $1,495,100.89 from the RASKO Bank of America accounts was spent on rent for kiosk and store locations at malls.

27. From in or about 2012 through in or about 2014, STANGA, VENUS, and GAYA owned and registered several vehicles in Virginia, Pennsylvania, New Jersey, and Georgia. These vehicles were owned and registered in the entity names and registered to

9

the residential addresses at the leased RASKO apartment complexes. RASKO bank and/or credit card accounts purchased the vehicles and paid for the vehicle registrations, maintenance, and fuel costs.

28. From in or about 2012 through in or about 2014, RASKO utilized a travel agency known as TRAVEX, LTD, based in Israel. RASKO employees and/or managers communicated via email regularly with this travel agency regarding airline reservations for employees and/or themselves. This travel agency assisted with making international airline reservations for employees to and from the United States.

29. From in or about 2012 through in or about 2014, international wire transfers were made from the RASKO bank accounts to an account held at Israel Discount Bank, known as R.Magedon Inc. Transfers were made from STANGA, VENUS, and GAYA accounts. In total, approximately $548,555.00 in international wires was transferred from RASKO Bank of America accounts to the R.Magedon, Inc. account at Israel Discount Bank.

30. From in or about 2012 through in or about 2014, domestic and international wire transfers were sent from RASKO accounts to numerous bank accounts name of known RASKO employees. Additionally, checks were written by conspirators, including the defendant, to known RASKO employees. Transfers were sent and checks written from STANGA, VENUS, and GAYA accounts. In total, approximately $2,083,638.89 in wires, transfers, and checks were paid from RASKO Bank of America accounts to RASKO employees, and at least $887,319.14 was paid to known B-2 employees.

31. From on or about January 19, 2012 through on or about January 23, 2012, GUR, GENISH, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada for RASKO employees. GUR purchased airline tickets for travel from RASKO regions to Las Vegas and reserved hotel rooms at the MGM Casino and Hotel in Las Vegas.

32. On or about May 9, 2012, GUR signed a lease with General Growth Properties for a kiosk location for STANGA at Park City Mall, Lancaster, Pennsylvania.

33. On or about July 11, 2012, GUR signed a lease with General Growth Properties for a kiosk location for STANGA at Lynnhaven Mall, Virginia Beach, Virginia.

34. On or about August 8, 2012, RASKO procured airline tickets on Delta Airlines for S.D. and O.D., B-2 visa holders, scheduled to travel to Virginia to work for RASKO. The tickets were scheduled from Tel Aviv, Israel to New York, New York.

35. On December 19, 2012, Y.A. sent an email to GUR with an attached visa extension letter to USCIS and a Form I-539 (B-2 visa extension application) for D.G., a B-2 visa holder who worked in the Philadelphia, Pennsylvania region, and details regarding other documents submitted with the extension. GUR then forwarded the email with the attachments to YONA, with the message "Case for example."

36. From on or about January 9, 2013 through on or about January 14, 2013, GUR, codefendant SHLOMO GENISH, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada for RASKO employees. GUR purchased airline tickets for travel from RASKO regions to Las Vegas and reserved hotel rooms at the MGM Casino and Hotel in Las Vegas.

37. On or about January 25, 2013, RASKO personnel in Israel sent an email to GUR and codefendant EYAL KATZ with a contract attached for codefendant BOAZ BEN CNAAN to start working as the area manager for Virginia. The contract detailed travel, housing, working, and pay arrangements.

38. On March 1, 2013, RASKO personnel in Israel sent an email to GUR and codefendants EYAL KATZ and BOAZ BEN CNAAN containing a biographical summary and travel reservations for codefendant GUY MAZON to come to the United States to begin

11

employment. GUR then forwarded this email to YONA.

39. On June 19, 2013, RASKO personnel in Israel sent an email to GUR and codefendants EYAL KATZ and SHLOMO GENISH concerning a new employee, H.B., who would be coming to work in Pennsylvania and was scheduled to arrive in the United States on June 27, 2013. The email contained a biographical summary that stated H.B. was Israeli and had a visa, an employment contract discussing her working and commission arrangements, and her flight details.

40. On September 10, 2013, GUR sent an email to codefendants SHLOMO GENISH with an attached form visa extension letter for codefendants GUY MAZON.

41. On or about September 30, 2013, RASKO personnel in Israel sent an employee housing list to GUR and codefendant EYAL KATZ, which GUR then forwarded to codefendant SHLOMO GENISH.

42. On or about December 10, 2013, codefendant SHLOMO GENISH sent an email to K.E., an employee at High Associates, Bentley Ridge apartment complex in Lancaster, Pennsylvania from his personal email account. He identified himself as GUR's business partner and provided a rental reference, utilizing Riverview Landing Apartments in Eagleville, Pennsylvania. He stated that GUR and he had been working with Riverview Landing for the prior three and a half years.

43. On December 10, 2013, an international wire transfer of $2000.00 was sent from VENUS *1919 to an account registered to H.B., a RASKO employee with a B-2 visa, at Bank Hapoalim, based in Israel.

44. From on or about January 16, 2014 through on or about January 20, 2014, GUR, codefendants SHLOMO GENISH, BOAZ BEN CNAAN, ZION SASON, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada. GUR purchased

12

airline tickets for employees to travel from RASKO regions to Las Vegas and reserved hotel rooms at the MGM Casino and Hotel in Las Vegas. RASKO purchased tickets to a Cirque-du-Soleil at the Mirage Casino and tickets for a buffet meal at the Bellagio.

45. On or about January 22, 2014, codefendant SHLOMO GENISH signed a lease for an apartment unit at 946 Bentley Ridge Boulevard, Lancaster, Pennsylvania, located at the Bentley Ridge apartment complex. The lease was made in the name of VENUS and GUR was added as a person authorized to have a key and have access to the apartment. The lease was for the period February 12, 2014 through February 12, 2015 at the rental rate of $1345.00 per month.

46. On or about June 3, 2014, B.R., a B-2 visa holder, and N.B., a US citizen, worked at a RASKO-leased kiosk at King of Prussia Mall in King of Prussia, Pennsylvania.

47. From on or about January 14, 2015 through on or about January 18, 2015, GUR, codefendants SHLOMO GENISH, BOAZ BEN CNAAN, ZION SASON, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada. GUR purchased airline tickets for employees to travel from RASKO regions to Las Vegas and reserved hotel rooms at the Palazzo Casino and Hotel in Las Vegas, Nevada.

48. On or about January 26, 2015, GUR signed a lease with Simon Malls for a kiosk at The Mall of Georgia, Buford, Georgia for GAYA. Codefendant ZION SASON was listed as the contact person.

49. On or about January 30, 2015, GUR signed a lease with General Growth Properties for a kiosk at Perimeter Mall, Atlanta, Georgia for GAYA.

50. On or about March 30, 2015, a check was written with GUR's authorization from the Stanga *1763 Bank of America checking account for $5000.00 to codefendant SHAI YONA. The check was cashed on March 31, 2015.

13

51. On or about April 8, 2015, GUR signed a lease with General Growth Properties for a kiosk at Perimeter Mall, Atlanta, Georgia for GAYA.

52. On or about July 1, 2015, a check was written with GUR's authorization from the Stanga *1763 Bank of America checking account for $775.86 to codefendant SHIMON MIZRAHI.

53. On or about August 27, 2015, a check was written with GUR's authorization from the Stanga *1763 Bank of America checking account for $7500.00 to codefendant BOAZ BEN CNAAN. The check was cashed on August 28, 2015.

54. On or about August 28, 2015, GUR, BEN CNAAN, and an unindicted coconspirator were seen meeting at MacArthur Center in Norfolk, Virginia.

55. On or about October 23, 2015, a check was written with GUR's authorization from the Stanga *1763 Bank of America checking account for $3500.00 to RASKO employee B.S. The check was cashed on October 30, 2015.

56. From on or about January 11, 2016 through on or about January 14, 2016, GUR, codefendants SHLOMO GENISH, BOAZ BEN CNAAN, ZION SASON, and other conspirators sponsored a RASKO convention in Las Vegas, Nevada. GUR purchased airline tickets for employees to travel from RASKO regions to Las Vegas and reserved hotel rooms at the Venetian Casino and Hotel in Las Vegas, Nevada. GUR, GENISH, BEN CNAAN, SASON, and other conspirators sponsored a RASKO awards ceremony and celebration at the Palazzo Casino and Hotel.

57. On February 29, 2016, GUR learned that RASKO's numerous Bank of America accounts had been restrained. GUR called Bank of America that afternoon and Bank of America told GUR that there was a hold on the account and provided the case number and the name of the assistant United States attorney (AUSA) to contact about the hold. That same

14

afternoon, GUR called the AUSA whose name was provided to him and left him a message asking him to return the call, which the AUSA never did. After attempting to contact the U.S. Attorney's Office, GUR called or received calls from codefendants ZION SASON, SHLOMO GENISH, and BOAZ BEN CNAAN.

58. The next morning, on March 1, 2016, GUR was arrested at 4:45 AM after arriving at the Raleigh-Durham airport. GUR was booked on a one-way flight from Raleigh-Durham to Toronto, Ontario, which GUR had booked on the evening of February 29, 2016 after speaking with Bank of America and attempting to the call the U.S. Attorney's Office.

59. On March 1, 2016, several employees who resided in VENUS-leased were interviewed at Riverview Landing apartments. It is Defendant's understanding that employees admitted that they were employed by GUR and codefendant SHLOMO GENISH and were working on B-2 visitor visas.

60. The defendant stipulates and agrees that his participation in the events described was undertaken knowingly, intentionally and unlawfully and not as a result of an accident, mistake or other innocent reason. The defendant further acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses charged in this case, nor does it identify all of the persons with whom he may have engaged in illegal activities.

15

Respectfully Submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By: /s/
Brian J. Samuels
Lisa R. McKeel
Kevin Hudson
Assistant United States Attorneys
Attorneys for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: brian.samuels@usdoj.gov
       lisa.mckeel@usdoj.gov
       kevin.hudson@usdoj.gov

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States could prove these facts beyond a reasonable doubt.

*Omer Gur*
Omer Gur
Defendant

I am counsel for Omer Gur. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Barry Boss, Esq.
Counsel for the Defendant