IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES | : |
| v. | : Cr. No. 4:16-00017 (RAJ) |
| OMER GUR, | : |
| Defendant. | : |

### DEFENDANT'S POSITION WITH REGARD TO SENTENCING FACTORS

Omer Gur, through counsel, hereby submits his position regarding various unresolved sentencing objections.

At the outset, it is important to note that Mr. Gur does NOT contest that he is responsible for the conduct attributable to him or for which he is accountable under U.S.S.G. § 1B1.3. Mr. Gur's objection is only to the legal conclusion that this conduct justifies the proposed Guideline adjustments.[1]

1) **The number of "documents" involved (Paras. 22 and 29, U.S.S.G. § 2L2.1(b)(2(C))**

The Presentence Report (PSR) enhances Mr. Gur's offense level by nine (9) points both for immigration fraud and for money laundering because the offense involved over 100 documents. At the outset, Mr. Gur admits his involvement in obtaining fraudulent immigration documents for some of his employees. He does not have an exact recollection of how many, but this definitely did occur.

---

[1] Because Mr. Gur does not contest the underlying "conduct" or "frivolously" contest it, his objections should have no impact on the credit he receives for acceptance of responsibility. *See* U.S.S.G. § 3E1.1, comment. (n.1(A)) (credit should be denied only where the defendant "falsely denies, or frivolously contests, relevant conduct." *See also United States v. Hargrove*, 478 F.3d 195, 199 (4th Cir. 2007).

At Mr. Genish's sentencing, the Court described the core conduct here as "really a scheme to prepare and submit fictitious B-2 Visas and extensions and applications, and I-539 forms all designed to perpetrate this fraudulent scheme against the U.S. here.  That's the essence of the fraud involved in this case . . . "  Genish Sent. Tr. at p. 9.

We do not take issue with the Court's description, but the PSR conflates the number of illegal employees (over 140) with the number of visa applications/extensions involving Rakso managers.  The company recruited employees in Israel who **already possessed** B2 visas.  We do concede that on multiple occasions, Rasko managers did assist prospective or current employees with the paperwork.  The statement of facts drafted by the government and incorporated into the PSR is consistent with this scenario.

> Page 8: "**If** prospective employees did not have a visa, Rasko personnel offered to assist individuals in obtaining one . . . " (emphasis added)
>
> Page 9: Prior to 2011, Rasko utilized the H-2B and J-1 visa programs, but in or about 2011, it "**began utilizing primarily B-2 visa holders** as its foreign workforce in the U.S. . . . " (emphasis added)
>
> Page 10: "**Once in the United States** and working for Rasko, managers, including the defendant, assisted **certain employees** holding B-2 visas to apply for and obtain (and in some cases pay for) an extension of stay . . . ." (emphasis added).

As the above excerpts from the statement of facts and PSR demonstrate, Rasko utilized B-2 visa holders, but as a general rule did not help those individuals obtain their visas initially.  Rasko was hiring B-2 visa holders, not obtaining B-2 visas for prospective employees.  Once the employees were here, there were certainly instances where Rasko mangers assisted employees in applying for and obtaining an extension of stay, but this was not something that regularly occurred.

The government maintains that it has located about 60 employees who applied for extensions. It is not clear that Mr. Gur or anyone else from Rasko assisted with all of these extension requests, but in any event, 60 documents would only result in a 6 point enhancement under § 2L2.1(b)(2)(B).

The government notes that all of the illegal employees (over 140) must have used false documents. We concede that this is true. But, the purely legal question is whether under the relevant statute, 18 U.S.C. § 1546(a), the defendant was involved with helping the employees obtain these false documents or whether the defendant accepted or received the fraudulent visa knowing it to have been procured by fraud or otherwise unlawfully obtained. There must be evidence regarding the number of documents and "it has to be specific to the defendant." *See United States v. Archer,* 671 F.3d 149, 162 (2d Cir. 2011) (vacating 9 level enhancement under § 2L2.1(b)(2)(C)). Our legal position is that although Mr. Gur knew that the employee had on his or her own obtained a visa,[2] Mr. Gur did not violate § 1546(a) in those cases where neither he nor any Rasko manager played a role in helping the employee obtain the visa or the extension. In addition, there is no allegation that Mr. Gur ever accepted or received fraudulently obtained visas from employees (and it does not make logical sense that Rasko would have asked for the employees to provide them with a B-2 visa that prohibited employment).

So, while we concede that some enhancement is appropriate under § 2L2.1(b)(2), the facts set forth in the PSR, taken as true, do not support the 9 point enhancement proposed in the PSR.

---

[2] Some employees undoubtedly obtained the B-2 visa fraudulently, but others might have obtained it legitimately with the intent at that time to travel to the United States as a tourist.

2) **The use of the visa to facilitate the commission of another felony other than an offense involving violation of the immigration laws (paras. 23, 30; U.S.S.G. § 2L2.1(b)(3)).**

As a matter of law, the defendant did not have reason to believe that a visa was to be used to facilitate the commission of a felony offense other than an offense "**involving violation of the immigration laws.**" U.S.S.G. § 2L2.1(b)(3) (emphasis added). At the outset, we concede that Mr. Gur knew that he was engaging in financial transactions with the proceeds from the immigration fraud offense. He accepts full responsibility for that conduct. The defense objection is purely a legal one: the "other" offense involves a violation of the immigration laws.

At Mr. Genish's sentencing, the government argued that this enhancement was appropriate because the visa fraud led to money laundering. Genish Sent. Tr. at 23. But, the money laundering is part and parcel of the immigration fraud. The money laundering stems from the fact that there were financial transactions resulting from the immigration fraud scheme. Indeed, the money laundering guideline relies on the underlying immigration fraud (referred to in the PSR para. 28 as "the substantive offense") for purposes of the offense level calculation. This clearly demonstrates that the two offenses are inextricably linked.

The § 2L2.1(b)(3) case law demonstrates that the triggering felonies are always separate from the immigration offense, i.e., the triggering felony could be committed even without the immigration offense. *See e.g.*, *United States v. Polar*, 369 F.3d 1248, 1256 (11th Cir. 2004) (with felony offense of obtaining a SSN card by false pretenses, court held that "fraudulent obtaining of the SSN cards itself was not 'necessarily committed in connection with the admission or exclusion of aliens'"); *United States v. Cabrera*, 1998 U.S. App. LEXIS 563, *6 (4th Cir. N.C. 1998) (drug trafficking activity under false identities); *Lejhanec v. United States*, 1999 U.S. Dist. LEXIS 20576, *13, 1999 WL 1487594 (E.D.N.Y. Nov. 29, 1999) (criminal activity included a conspiracy to obtain fraudulent tourist visas to facilitate the felony offense of

transporting women in foreign commerce for the purpose of prostitution). In each of the cases, the triggering felony could occur independent of the immigration fraud offense.

Because of the broad nature of the money laundering statute, "it is virtually impossible to commit a fraud crime without engaging in one of the types of monetary transactions covered by the money laundering statute." Frank Bowman, The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History, 35 Indiana L.R. 5, 32 (2001). In other words, most immigration fraud cases will necessarily involve money laundering and that would automatically result in the four (4) point enhancement, regardless of whether money laundering is even charged (pursuant to relevant conduct principles). Such a broad interpretation is at odds with the notion that an upward adjustment (particularly one for 4 levels) should involve aggravating conduct which is beyond that necessary to justify the base offense level. Here, the financial transactions serving as the basis for the money laundering conviction are derived from, and thus involve, the violation of immigration laws. Thus, the four point enhancement is inapplicable.

**3) The enhancement under 3B1.1(a) for Mr. Gur's role in the money laundering (para. 33)**

The defendant should not receive an adjustment for role in the offense because Mr. Gur was not an organizer or leader of the money laundering activity. Again, to be clear, Mr. Gur admits that he had a supervisory position in Rasko, that he was a signatory on the bank accounts and that had a greater role in conducting financial transactions than others involved in the conspiracy. But, as a matter of law, he should not receive an adjustment for role in the offense because the "money laundering" conduct was part and parcel of the immigration fraud.

The money laundering guideline makes clear that where, as here, the offense level is determined based on the underlying substantive crime, any adjustment for role in the offense

5

must be based on "the laundering of criminally derived funds" and "not on the underlying offense from which the laundered funds were derived." U.S.S.G. §2S1.1, comment. (n.2(C)). The application note requires the Court to examine the money laundering conduct to determine if there is any discrete money laundering activity over which the defendant exercised a leadership role that is not also subsumed by the conduct constituting the underlying crime of immigration fraud. This interpretation is consistent with the underlying objective of the amendment to the money laundering guidelines, § 2S1.1 et seq., in 2001 to "tie[] offense levels for money laundering more closely to the underlying conduct that was the source of the criminally derived funds. . . ." Amendment 634 (Reason for Amendment).

The Eleventh Circuit addressed this issue in *United States v. Salgado*, 745 F.3d 1135 (11th Cir. 2014). *Salgado* involved a defendant who was charged with conspiracy to distribute drugs and conspiracy to launder money. At sentencing, the district court, applying §2S1.1(a)(1) (which incorporates the offense calculation for the underlying crime), included an enhancement for role in the offense because of the defendant's role in brokering a particular heroin deal and his involvement in other transactions. *Id.* at 1137. The 11th Circuit, in an opinion written by Judge Carnes (who served as a United States Sentencing Commissioner), vacated the sentence because any role adjustment had to be based on the defendant's specific role in the money laundering conspiracy, not merely the underlying drug conspiracy. *Id.* at 1138-9. Relying on cases from the First, Second, Sixth, Seventh and Tenth Circuits, *Salgado* squarely holds that that a Chapter Three adjustment is permissible only "when the [adjustment] relates to the money laundering itself rather than to the underlying offense (the offense that generated the money that the defendant laundered)." *Id.* at 1139 (internal quotation and citation omitted).

6

Thus, in order to qualify for a role enhancement here, Mr. Gur's leadership of the money laundering conspiracy must be based on something above and beyond the underlying immigration fraud conspiracy. The PSR fails to set forth any facts that demonstrate that the financial transactions serving as the basis for the money laundering charges are independent of the immigration fraud. *See* PSR at pps. 11-18 and ¶ 15. Thus, there is no legal basis to impose a money laundering leadership enhancement in this case.

Dated: October 20, 2016                                          Respectfully submitted,

By: _____/s/_____
L. Barrett Boss (*pro hac vice*)
S. Rebecca Brodey (VSB # 81163)
COZEN O'CONNOR
1200 19th Street, N.W., Suite 300
Washington, D.C. 20036
(202) 912-4818
(866) 413-0172 (fax)
bboss@cozen.com
rbrodey@cozen.com

_____/s/_____
James O. Broccoletti, Esquire
VSB#17869
ZOBY, BROCCOLETTI & NORMILE, P.C.
6663 Stoney Point South
Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
james@zobybroccoletti.com

*Attorneys for Defendant Omer Gur*

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 20, 2016, I electronically filed the foregoing Position with Regard to Sentencing Factors, which will send notice of such filing to the following registered CM/ECF users:

      AUSA Brian James Samuels
      Office of the United States Attorney
      Suite 300
      Fountain Plaza 3
      721 Lakefront Commons
      Newport News, VA 23606-0000
      Brian.Samuels@usdoj.gov

      AUSA Lisa Rae McKee
      Office of the United States Attorney
      Suite 300
      Fountain Plaza 3
      721 Lakefront Commons
      Newport News, VA 23606-0000
      Lisa.McKeel@usdoj.gov

      AUSA Kevin Hudson
      Office of the United States Attorney
      Suite 8000
      8000 World Trade Center
      101 West Main Street
      Norfolk, VA 23510-1624
      kevin.hudson@usdoj.gov

                                        /s/
                                    S. Rebecca Brodey