**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

_____

| | |
|---|---|
| UNITED STATES | : |
| | : |
| v. | :    Cr. No. 4:16-00017 (RAJ) |
| | : |
| OMER GUR, | : |
| | : |
| Defendant. | : |

_____ :

**MEMORANDUM IN AID OF SENTENCING**

**I.     INTRODUCTION**

Omer Gur, a 36 year old Israeli war hero with two young children and no prior criminal

record, will come before this Court for sentencing on October 27th.  Mr. Gur has accepted

responsibility for his criminal conduct and embarked on an effort to provide substantial

assistance to the government.  In light of Mr. Gur's personal background, the impact of this

conviction upon him and his family, and the nature of the offense conduct, a significant variance

is justified in this case.  As set forth in further detail in this memorandum, we ask the Court to

consider the following factors:

- The offense **began** as a legitimate and legal enterprise.  It was not a predatory
  fraud scheme and did not take unfair advantage of the employees.  The company
  started in 2005, but the visa fraud did not begin until 2011 when the U.S.
  government stopped issuing work visas to Israeli employees coming to work at
  the kiosks. This does not in any way excuse the criminal conduct, but it does
  render Mr. Gur far less culpable than other individuals who are involved in long-
  term fraud schemes that were illegal from the start and that were predatory in
  nature.

- Mr. Gur's punishment goes far beyond the amount of imprisonment that will be imposed upon him.  During his seven months of pretrial detention, he has not been allowed to see his two young children and, after he completes his prison term, he (and effectively his wife and children—all of whom are U.S. citizens) will be deported.

- Other than the conduct giving rise to this case, Omer Gur has led an exemplary life in which he served honorably as an Israeli Navy Seal; contributed significantly to his community both in Israel and in North Carolina; and provided invaluable support for everyone in his life in times of need, including his wife, children, friends and Rasko employees.

## II.    SENTENCING FACTORS

This Court has deep experience with sentencing issues and is responsible for some of the most important jurisprudence in this area.  Accordingly, we will not devote space to setting forth the criteria that the Court must consider under 18 U.S.C. § 3553(a).  This Court is well aware that the objective at sentencing is to impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.  18 U.S.C. § 3553(a).

### A.    Nature of the Offense

Based on some of the Court's remarks at Mr. Genish's sentencing, it appears that the Court may have a misimpression of the nature of the criminal conduct here.  In that proceeding, the Court focused on the "prolonged nature" of the offense and that the defendant "spent years" involved in the conspiracy.  Genish Tr. 9/26/15 at 43-44.  In addition, the Court referred to the 140 employees who were here illegally as "victims."  Genish Tr. 9/26/15 at 39.  But, there was

much more to the business than the illegal operations and, as set forth in further detail below, the employees were voluntary participants who were treated well.

At the outset, we agree with the Court that the length of the criminal activity is a legitimate consideration at sentencing. But, as sentencing experts advising the ABA have emphasized, the nature of the criminal activity must also be considered. For example, a three-year predatory fraud, like a Ponzi scheme, where the sole purpose was to steal money and enrich the wrongdoers, should be treated differently than a three-year offense that started as a legitimate business but "crossed over into criminality as a result of unexpected difficulties." ABA Criminal Justice Section, "A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes," at 3 (November 10, 2014) (classifying such offenses as "legitimate ab initio" and distinguishing them from "predatory" offenses). Unlike the ABA Task Force recommendations, the United States Sentencing Guidelines treat predatory and legitimate ab initio offenses with the same degree of culpability in white collar offenses. They are not. Unlike most crimes against the person, which are distinctly separated by measures of culpability (e.g., "second degree" murder, "simple" assault), there is no such distinction for most white collar offenses.

Here, as set forth in the Presentence Report (p.9), the offense did not begin as a predatory one or one which was designed to commit a fraud on the government. Instead, the business began in 2004 "on the backs" of **legal** employees—H-2B visa employees, J-1 visa employees, and Mr. Gur himself. It was not until the Department of State stopped issuing work visas to Israeli kiosk employees in approximately 2011 that Mr. Gur turned to the illegal conduct that now places him before the Court. The change in the visa programs is not an excuse for Mr. Gur's criminal conduct, but it demonstrates that he is less culpable than an individual who, from

the outset, started a company with the intention of committing immigration fraud or exploiting undocumented workers.

The dates of the conspiracy are 2011 until Mr. Gur's arrest in March 2016. PSR at p. 6. The story behind Mr. Gur's offense, however, began years before he ever engaged in illegal activity. It began in 2003, when Mr. Gur completed his four-and-a-half years of military service as a Navy Seal, and set out to travel and obtain some relief from the stress of war at the age of 23. Like so many Israelis who view travel to the United States, South America, or Europe, as a "rite of passage" following their military conscription, Mr. Gur came here to figure out his next steps in life after almost five years as a wartime sailor. "Israel and US at Odds Over Visa Waiver Program," *Times of Israel*, available at http://www.timesofisrael.com/israel-us-at-odds-over-visa-waiver-program/ (describing phenomenon of Israelis coming to the United States after military service).

### (1) The Origins of Rasko

Opportunity knocked in 2004 when his lifelong friend, Eyal Katz, called Mr. Gur (who was travelling through South America at the time) and offered him an opportunity to join Mr. Katz in the kiosk business. At the time, working at shopping mall kiosks was a popular job for young Israelis. "Israelis Risk Permanent Ban to Work at US Malls," *Times of Israel*, available at http://www.timesofisrael.com/israelis-risk-permanent-ban-to-work-at-us-malls/ Since as early as 2001, "thousands of Israelis" have been traveling to the United States to work at these kiosks. *Id*.

Seeing an opening in the kiosk industry, Omer Gur and Eyal Katz started their company, Rasko, in or around 2005. The first kiosk was in Charlotte, North Carolina. They sold decorative fish. Mr. Gur and one other person staffed the kiosk while Mr. Katz managed the

business side—it took Mr. Gur two years to earn $50,000. They paid sales tax and income tax (at the time one could get a taxpayer ID with a driver's license).

### (2)    Rasko Grows

In 2005, a friend approached Gur and Katz and offered them the opportunity to run four shopping mall kiosks in Raleigh, North Carolina, selling Dead Sea skin care products. Given the Israeli connections, this seemed like a natural fit, and they took over the business. With a lot of hard work, the business grew. They located most of the initial employees through mutual friends. By 2010, Rasko had expanded into Virginia and Pennsylvania with approximately 15 shopping mall kiosks.

For years, Rasko hired employees through the H-2B and J-1 Visa programs. *See* Statement of Facts at 10; *see also* PSR at 9. The company retained immigration lawyers so that it could recruit and hire Israeli employees *legally*. In 2007, the company received approval from the Department of Labor to hire 36 H-2B workers. In 2008, the company received approval from the Department of Labor to hire 87 H-2B workers. In 2009, the company received approval for 34 workers. In 2010, it received approval for 33 workers.[1] It had received approval to hire 33 workers for 2011, but that approval was revoked.

### (3)    The Conspiracy Period

Beginning in 2011, one year before the federal government began its investigation, U.S. immigration policy changed, and young Israelis could no longer obtain legal work permits for employment in the kiosk business. PSR at 9. Rasko was at an impasse, and its operations could no longer continue. Rather than close down the business—which Mr. Gur now recognizes they should have done—Rasko managers continued to operate the business with Israelis who were in the country on visas (or who already possessed such visas and would be entering the country)

---

[1] In addition to the H-2B employees during this period, Rasko employed about 10 (ten) J-1 employees every summer.

which did not authorize them to be employed. Mr. Gur made the wrong decision – an error he freely acknowledges – because, at the time, he was unable to confront the reality that he needed to close a business he had worked so hard to build from scratch.[2] Plus, he was a newlywed who was about to start a family. Under those circumstances, Rasko began to hire Israelis who already had B2 tourist visas. *See* Statement of Facts at 11; *see also* PSR at 8-9. Most employees came to Rasko through referral of other employees or its recruiting agency in Israel. Mr. Gur's day-to-day tasks consisted of traveling to different kiosks, coordinating with his supervisors and managers via telephone, ordering products, and responding to emergencies that his management team could not handle.

While, as the Court noted at Mr. Genish's sentencing, this conspiracy transpired for a period of years, it did not begin as a criminal enterprise.

### (4) Employees Treated Better than Most Undocumented Workers[3]

---

[2] Although at various times, Mr. Gur attempted to operate the business with U.S. employees, it was never successful. While we do not have empirical data to explain this phenomenon, Mr. Gur believes it is because the success of the kiosk business depends on employees being extremely proactive and, to put it bluntly, "pushy." Mr. Gur found it impossible to find U.S. employees who were both willing to aggressively pursue mall shoppers to make sales and were successful in doing so. Mr. Gur's opinion is that as a cultural matter, the Israelis are much more willing to solicit strangers in a shopping mall for business and "not take no for an answer."

[3] *See*, *e.g.*, *Hidden America: Undocumented Workers*, WORKPLACE FAIRNESS, http://www.workplacefairness.org/sc/undocumentedworkers.php (last visited Oct. 20, 2016) (common protections routinely denied undocumented workers: the right to receive wages; the right to healthy working conditions; the right to workers' compensation for injuries; the right to be free of discrimination); Eunice Hyunhye Cho, *Exploiting Immigrants: Labor Laws Need to Protect Undocumented Workers, Too*, THE MERCURY NEWS (April 23, 2013, 11:07 AM), http://www.mercurynews.com/2013/04/23/exploiting-immigrants-labor-laws-need-to-protect-undocumented-workers-too/ (Immigration policies have allowed unscrupulous employers to abuse undocumented employees); Harold Meyerson, *Protecting Undocumented Workers*, LOS ANGELES TIMES (June 24, 2011), http://articles.latimes.com/2011/jun/24/opinion/la-oe-meyerson-undocumented-abuses-20110624 (undocumented workers lack on-the-job protections that most Americans take for granted… [d]ay laborers are required to pick up potential biologically hazardous material without the standard hazmat protective equipment).

At Mr. Genish's sentencing, the Court referred to the employees in this case as "victims." Tr. 9/26/16 at 39. The "victims" in this case, however, are in a far different position than most employees in immigration fraud conspiracies.[4] In Mr. Gur's kiosk business, no one was taken advantage of—rather, the Israelis supported one another. As the boss, Mr. Gur provided his employees with comfortable apartments, transportation, and a sense of community. While his actions were illegal, they were carried out with a sense of compassion and caring that is truly unique to Mr. Gur and his community.

This compassion comes through when talking to Mr. Gur's former employees that have returned to Israel. Former employee, Viki,[5] recalls that Mr. Gur and others at Rasko provided her with much needed support during the Lebanon War when she feared for her family's safety. The war had forced her family to evacuate from their home and move far away, "it was a very delicate situation and I couldn't have gone through this without them [Omer and Eyal]." Former employee, Shira, described the employees' living and working conditions as "very good." She notes that the employees had "a very beautiful apartment" and management would arrange for birthdays and Jewish holiday celebrations. "They gave something special like a gift or like a big cake and balloons and make big dinner for us 'cause of Hanukkah Jewish holiday."

---

[4] *See e.g.*, *United States v. Chaudary*, 12-cr-20123 (CM) (D. Kansas) (employing undocumented workers in his hotel and grossly underpaying them) Gov't Sentencing Memo, Dkt. No. 178 (March 3, 2015), *United States v. Chen*, 10-cr-209 (TCB) (N.D. Georgia) (exploiting undocumented restaurant workers by subjecting them to long shifts, substandard pay, and poor working conditions), FBI Press Release (Apr. 21, 2011), available at https://archives.fbi.gov/archives/atlanta/press-releases/2011/business-owners-sentenced-for-employing-illegal-aliens, *United States v. Saleem*, 08-cr-347 (LMB) (E.D. Va) (contracting undocumented workers through his sham staffing agencies and then passing along only a portion of their hourly fees) "Man Sentenced for Visa Fraud," localKicks Community News (Nov. 17, 2008) available at http://www.localkicks.com/community/news/Man_sentenced_for_Visa_fraud.

[5] Several former employees were interviewed in Israel in preparation for Mr. Gur's sentencing. Those interviews are being provided to the Court and to the government via a separate video submission.

Former employee, Moran, described how working for Rasko provided not just financial support but also emotional support after the employees' military service.  She noted that most of the employees were both "fragile" and "confused," having just finished spending two to four years in the military where they were involved in the war and where they had seen "very, very [] bad things."  Moran also explained how Mr. Gur provided guidance as to the employees' futures, encouraging them to use the money they were earning for education and talking to them about "how to think about your next steps."  Notwithstanding the illegality of their employment, Mr. Gur—and Rasko—treated the employees like family.

The harboring statute under which Mr. Gur was convicted was enacted, in part, to prevent the type of employment that preyed upon undocumented workers and depressed working conditions in the United States—a far cry from the working conditions of the kiosk workers in this case.  The legislative history communicates the need to protect illegal workers from exploitation:

- o "[M]any experts believe that they also depress working conditions in the industries in which they are concentrated. Because of their illegal status, the workers cannot take the chance of drawing attention to themselves by demanding safe and healthy working conditions."  S. REP. NO. 166—Part III, 18631-34 (1978).

- o "In response to the increased number of aliens seeking entry and the restrictive measures instituted along our borders to control it, alien smuggling has developed into a large illegal business. The smugglers, 'coyotes' as they are called, prey upon those seeking a better standard of living. Aliens are often charged exorbitant amounts for transportation into the United States, and the indications are that the business is thriving." *Id*.

For most of Mr. Gur's employees, a season working at a kiosk was a huge opportunity.  Young Israelis were able to travel to the United States for short periods of time and earn enough to pay for college, "insane amounts" compared to what they could earn in Israel.  http://www.haaretz.com/israel-news/business/.premium-1.558839.  They were also able to

experience a standard of living unavailable to them in Israel, paying "tiny rent at an amazing [apartment] complex with a pool and fitness room." *Id*. Despite the illegality, young Israelis continued to take these jobs. *Id*. Why? They did so for some of the reasons that motivate most undocumented workers—desperation and a desire to experience a piece of the "American Dream." These opportunities to earn a substantial salary at a young age do not exist in Israel, where unemployment is pervasive and one in five live below the poverty line.[6]

Most Israelis, including Mr. Gur, also did not appreciate the severity of this offense. As demonstrated by the several press articles cited in this memorandum, the phenomenon of kiosk workers in the United States has been reported for years. Enforcement by the United States government, however, only began recently. Indeed, undersigned counsel has only been able to find one reported case of Israeli kiosk workers facing criminal charges. (*United States v. Nadivi, et a*, 13-cr-179 (DSD) (D. Minn.).[7,8] In *Nadivi*, the two defendants who have already been sentenced received only sentences of probation.[9] *See* Judgment as to Yosi Rachamamim, Dkt

---

[6] Weinglass, Simona, "Where Are Israel's Good, Honest Jobs?", *Times of Israel* (June 5, 2016), available at http://www.timesofisrael.com/where-are-israels-good-honest-jobs/ (explaining that, despite its technological advancements, Israel is a country that is plagued by poverty and joblessness—one out every five Israelis lives below the poverty line, disposable income inequality is the highest in the developed world, the cost of living in relation to salary is higher than every OECD country except Japan, and Israel has one of the lowest shares of hospital beds per capita in the developed world).

[7] There is one other case in Nevada but, unlike this case, that case involved an organized crime group and extortion charges. *See* ICE News Release, "California man sentenced on extortion charges involving Las Vegas shopping mall and casino kiosks," (Feb. 17, 2012), available at https://www.ice.gov/news/releases/california-man-sentenced-extortion-charges-involving-las-vegas-shopping-mall-and

[8] There is one other case in Texas but public documents suggest that the employees were all deported and no charges were ever filed. *See* Rosenberg, Shmarya, "Israeli Bath Salts Workers Busted on Immigration Charges," *FailedMessiah.com* (Jan. 30, 2013), available at http://failedmessiah.typepad.com/failed_messiahcom/2013/01/israeli-shopping-mall-kiosk-workers-arrested-in-texas-on-immigration-charges-456.html

[9] The remaining defendants, Avraham Nadivi and Adam Vaknin, are fugitives. *See* Docket.

No. 150 (probation) (Oct. 8, 2014); *see also* Judgment as to Yehiel Shpitser, Dkt. No. 152 (probation) (Oct. 8, 2014).

**B.      History and Characteristics of the Defendant**

**(1)      Mr. Gur's Devotion to His Family**

It cannot be disputed that Mr. Gur is a dedicated family man.  Mr. Gur first met and fell in love with his wife, Sivanne Fishel, in 2007 when she was visiting her sister in North Carolina. PSR ¶ 60.  The young couple quickly became close, and Ms. Fishel decided to attend college in North Carolina so that she could be close to both Mr. Gur and her sister.  They married in 2009 and, as noted above, together they have two children—a four-year-old daughter and a one-year-old son.  PSR ¶ 61.

Mr. Gur shows his love to his family by providing for them financially and by providing help at home.  As his wife notes in her letter to the Court, "he put his needs last to make sure [his wife and children] were always happy and taken care of."  Ltr. from Sivanne Fishel.[10]  He gives the children their baths at night, reads to his daughter every night (unless he is traveling for work), drives his daughter to pre-school, cleans the dishes after dinner, and gets up throughout the night to give his son a bottle, so that his wife can sleep.  After the births of each child, Omer took six weeks off from work to help his wife.  Also, when his wife received a job offer in visual merchandising (her career prior to motherhood), Mr. Gur agreed to stay home two days a week so that his wife could take advantage of this work opportunity.  Ltr. from Penny Fishel.  They did not need the additional income but Mr. Gur knew it was important to his wife to have a sense of career outside the home.  Although the Gurs are young and (prior to the forfeiture and legal fees arising from this offense) financially comfortable, their entire life is about one thing—family. Mr. Gur does not go to parties, he barely drinks, he has never engaged in drug use, he does not

---

[10] Letters submitted to the court on Mr. Gur's behalf are attached to this memorandum as Exhibit 1.

purchase expensive clothing or eat out at expensive restaurants, and he is faithful to his wife. Outside of this offense, Mr. Gur's life has centered on taking care of his wife and children.

### (2)    Mr. Gur's Childhood in Israel

Mr. Gur was born and raised on the outskirts of the Israeli town of Nazareth Illit ("Upper Nazareth").  PSR ¶ 47.  Because the city overlooks Nazareth, the largest Arab city in Israel and the birthplace of Jesus, Mr. Gur was raised in a diverse community of Jews, Muslims, and Christians—a unique environment in a predominately Jewish and Arab state.  PSR ¶ 54; *see also* Miller, E., "Nazareth's dwindling Christian populace torn between moving out, fighting back," Times of Israel (Oct. 11, 2013) http://www.timesofisrael.com/nazareths-dwindling-christian-populace-torn-between-moving-out-fighting-back/

As a young boy, Mr. Gur enjoyed soccer, basketball and playing with the other children in his neighborhood.  PSR ¶ 48-49.  Mr. Gur was a natural leader among his friends, and he was also a peacemaker.  In his letter to the Court, Nir Smilga recalls falling off a tree and breaking his leg and how "Omer carried me the entire way up on his shoulder and brought me back home to my parents."  Ltr. from Nir Smilga.  Despite the political divide between Jewish and Arab Israelis, Mr. Gur had friends of all religious backgrounds.  In his interview, Yair Gur describes how the first Arab family moved to the Gur's neighborhood and how it was little Omer Gur who took the lead in befriending the Arab family's son and set "an example of how to treat others, other people that are not like you."

When Omer was 10 years old, his childhood was profoundly impacted when his father lost his job and his country went to war.  PSR ¶ 50, 54.  After losing his job, Mr. Gur's father ceased taking care of the family—he spent significant portions of time out of the home, he wasted the family's money on purchases such as flight lessons and international trips, and, when home, he was angry and lashed out at both Mr. Gur and his mother.  PSR ¶ 50-53.  In his letter to the Court, Matan Elipaz recalls that Mr. Gur's mother was a kind and loving caretaker but that

Mr. Gur's father was "never around." *See* Ltr from Matan Elipaz. On several occasions, Mr. Gur was beaten by his father. PSR ¶ 53.

Around the same time in 1990, the Gulf War began. Under threat of nuclear and chemical attack, ten-year-old Omer was required to wear a gas mask. PSR ¶ 54. From this period onward, terrorist attacks became a frequent occurrence in Israel with bombings taking place on busses, at cafes, and in marketplaces. PSR ¶ 54. Israel was also attacked by ballistic missiles. PSR ¶ 54. As a young boy, Mr. Gur was forced to hide in bomb shelters with his family during missile attacks from Iraq. PSR ¶ 54. On many days, it was too dangerous for the boys to even leave the house. PSR ¶ 54.

While Mr. Gur, knowing nothing else, views his childhood as "normal," the damaging effects that war has on a child cannot be denied. Children exposed to war-related stressors over long periods of time suffer from severe posttraumatic stress, "manifested by anxiety disorders such as posttraumatic stress disorder and other psychiatric morbidities including depression, disruptive behaviors, and somatic symptoms." Freh FM, "Psychological Effects of War and Violence on Children," *J. Psychol. Abnorm. Child* S1:e001. doi:10.4172/2329-9525.1000e001 (2015).

When Mr. Gur's home life and community became unstable, Mr. Gur reacted by trying to create stability for his family. He found work cleaning yards and working at a neighbor's dairy farm. He used that money to help support his family. He also found work selling flowers. At the end of his week, he would save one bouquet that he did not sell—instead, he gave that bouquet to his mother. *See* Ltr. from Sharon Gur. Although he had two older siblings, Mr. Gur was the caretaker.

### (3) Mr. Gur's Military Service

During his military service, Mr. Gur continued to distinguish himself as that same boy who was always looking out for others. Mr. Gur was admitted to an elite branch of the Israeli

Navy, the "13 Marine Commando," comparable to the United States' Navy Seals. Ltr. from Yinnon Ashkenazi. Mr. Gur had to undergo rigorous testing, both mental and physical, for admission into this branch of the military. In her letter to the court, Ellie Rakovchik recalls how she would see Mr. Gur prepare himself for that testing, "training like clock-work running the hilly landscape of our town." Ltr. from Ellie Rakovchik.

Mr. Gur excelled in the military and became a leader and a role model. One of Mr. Gur's naval roommates, in his letter to the court, says that Omer woke up early every morning and cleaned the room and organized both their lockers while the roommate slept. Ltr. from Yaar Keren. In his letter to the Court, Ori Sharaf recalls meeting Mr. Gur "in the middle of a life risking situation" and how Mr. Gur comforted him and helped him get through the operation. Ltr. from Ori Sharaf.

Mr. Gur was also a war hero, having fought in the well-known operation "Karin A," where he had to capture a heavily armed ship 200 miles off the coast of Israel. *See* Ltr. from Tal Peretz. In his letter to the Court, Mr. Peretz notes that he was very worried going into the mission, until he saw Mr. Gur's name listed as leader of the one of the boats, "I knew immediately that with Omer appointed leader, I didn't need to worry." *Id.* Like his adolescence, Mr. Gur's military service is marked by his selflessness and leadership.

### (4)     Mr. Gur's Assistance to the Government

Since his arrest, Mr. Gur has also attempted to provide substantial assistance to the government. When determining Mr. Gur's sentence, the Court should consider this cooperation because it demonstrates his acceptance of responsibility. *See, e.g.*, *United States v. Robinson*, 741 F.3d 588, 600 (5th Cir. 2014) (holding that the district court procedurally erred in finding that it lacked discretion to consider a defendant's cooperation with authorities in the absence of a U.S.S.G. § 5K1.1 motion from the Government); *United States v. Fernandez*, 443 F.3d 19, 34 (2d Cir. 2006) (noting that sentencing judge had the authority to issue a downward variance for

cooperation pursuant to § 3553(a) even in the absence of a government motion);  *see also United States v. Gapinski*, 561 F.3d 467, 477 (6th Cir. 2009) (vacating sentence where the record did not reveal that the district court fully considered the defendant's argument for a variance based on his substantial assistance to the government).  Mr. Gur has even submitted a proposal that he believes could help alleviate the problem of Israelis coming to the United States to work illegally.  Taken together, Mr. Gur's personal characteristics and cooperation warrant a variance from the Guidelines.

### C.    Just Punishment

#### (1)    Deportation

Section 3553(a)(2)(A) provides that the sentencing court shall consider the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]"  Most courts, including several Supreme Court justices, have recognized that *deportation is punishment.  See, e.g.*, *NG Fung Ho v. White,* 295 U.S. 276, 284 (1992) (deportation may result in the loss of "all that makes life worth living"),  *Jordan v. De George*, 341 U.S. 223 (1951) (Jackson, J.) ("Although not penal in character, deportation statutes as a practical matter may inflict the equivalent of 'banishment or exile' and should be strictly construed"), *United States v. Gomez-Jimenez*, 750 F.3d 370, 384 (4th Cir.), as corrected (Apr. 29, 2014), cert. denied sub nom. *Juarez-Gomez v. United States*, 135 S. Ct. 305, 190 L. Ed. 2d 222 (2014) and cert. denied, 135 S. Ct. 384, 190 L. Ed. 2d 271 (2014) and *United States v. Salguero-Ortiz*, 483 F.App'x 858, 863-64 (4th Cir. 2012) (citing *United States v. Hyppolite*, 65 F.3d 1151, 1159 (4th Cir. 1995)) (while the Fourth Circuit has held that a sentencing court is not required to consider a person's deportable status and the consequences that flow therefrom, it has concluded that district courts have discretion to impose below-guideline sentences for reasons related to the defendant's deportable status).  A number of other circuits have also concluded that a sentencing court may consider a defendant's alien status in determining an appropriate

sentence.  *See, e.g.*, *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997); *United States v. Smith*, 27 F.3d 649, 650 (D.C. Cir. 1994).

"Everyone knows that to be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment[;] and that oftentimes most severe and cruel."  *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893) (Brewer, J., dissenting).  Here, deportation is an incredibly cruel punishment for it is not only banishing Mr. Gur from this country, but it is also uprooting his wife and children and breaking up his family.  Mr. Gur and his wife have lived in North Carolina for almost 10 years.  They live in close proximity to Ms. Fishel's mother (who moved in with the family to assist Ms. Fishel after Mr. Gur's arrest), Ms. Fishel's sister and brother-in-law, and the children's cousins.  Ms. Fishel's second sister, Sharonne, lives in New Jersey.

Mr. Gur and Ms. Fishel came together with a common dream for their family—to give their children the opportunities they did not have in Israel and to raise them in a country free from pervasive war and terrorism.  The children are United States citizens, they do not have Israeli citizenship, and they do not speak Hebrew.  In losing his ability to support and raise his family in America, Mr. Gur is suffering more than similar defendants.

Moreover, the two people suffering the most from this offense are not Mr. Gur or his wife, but his daughter and son.  As Ms. Fishel states in her letter to the court, the children will continue to suffer through their father's prolonged absence, their eventual uprooting to Israel, and the subsequent separation from their grandmother and extended family.  The impact that deportation will have on Mr. Gur and his entire family is draconian and, therefore, a variance is warranted.

### (2)    Separation from his Children is Additional Punishment

Mr. Gur's son was born in July 2015, just 8 months before Mr. Gur was arrested. Because Mr. Gur has been held in custody at Western Tidewater Regional Facility, he has not

been able to see his children since his arrest (visitors to the jail must possess a driver's license and are limited to one brief late evening visitation per week). Mr. Gur has missed his son's first steps, his first words, and so many parts of the first months of his life. Mr. Gur's son will never bond to him as a child bonds to his father. When Mr. Gur is finally released from prison, his son will likely be in grade school. While they will be able to start a relationship eventually, Mr. Gur's opportunity to be there for his son in these critical formative years is gone. Mr. Gur will also miss many remaining years of his young daughter's childhood. Mr. Gur's separation from his young children is devastating and makes his imprisonment more severe than it would be at any other time in his life.[11]

### D. Deterrence

A lengthy sentence of incarceration is not necessary to promote general deterrence. The data suggests that the interests of society can be served just as effectively by a short prison sentence or alternative sentence in many white collar cases. For example, a wide-ranging study of white-collar defendants revealed *no difference* in deterrence between probationary and prison sentences. *See* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ("There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms.").

Rather, for this group of offenders, the combination of societal opprobrium, loss of past and future employment prospects, shame to family and friends, and financial penalties serve as the more powerful deterrents to future crime.

---

[11] So that Mr. Gur's children will be able to visit their father while he is in prison, undersigned counsel will respectfully request at sentencing that the Court recommend a BOP designation to FCI Butner.

As noted above, Mr. Gur's case marks one of the first high profile prosecutions of Israeli kiosk employers. In the only case that has been publicly reported—*Nadivi*—the two defendants received probation. News of Mr. Gur's conviction has been widespread, with both United States and Israeli news outlets reporting his arrest and guilty plea. His sentence will also likely be reported. Any prison sentence, long or short, will deter future Israelis from engaging in similar conduct.

### E.     Risk of Recidivism

Mr. Gur presents no risk of recidivism. A report funded by the Department of Justice identifies several factors that can increase (none in play here) or decrease a person's risk of committing a new offense or being revoked during their period of supervision. Factors that increase risk include criminal history, gender, race, drug abuse problems, mental health issues, unemployment and the need for financial help, housing, and transportation. *See* William Rhodes, et al., *Recidivism of Offenders on Federal Community Supervision* 11 (Cambridge, MA: Abt Assocs., 2012). Factors that decrease risk include having a strong social support system, marketable educational and vocational skills, motivation to change, and age. *Id*.

First, Mr. Gur will most likely be deported at the end of his sentence—making any risk of recidivism close to zero. Moreover, even if Mr. Gur were to remain in the United States, he has a very strong support system as evidenced by support from his family and community. He has always been a hard worker and, in light of his strong support network, education, business acumen, and work experience, will surely be able to maintain a stable future with no risk to the community. In light of Mr. Gur's background, intelligence and extraordinary acceptance of responsibility, there is no risk of his reoffending.

### F. The Kinds of Sentences Available, the Sentencing Guidelines, and Guideline Policy Statements

The PSR calculates Mr. Gur's offense level at 30 (with a three point reduction for acceptance bringing the total offense level to 27).[12] This offense level overstates Mr. Gur's actual culpability to a significant extent because 1) the Guideline and its enhancements are not based on any empirical data; 2) the Guideline calculation involves double, and in some cases triple, counting of the same conduct; and 3) the ultimate offense level produced is disproportionately high when compared to far more serious offenses.

Similar to the guidelines for certain drug offenses—with which this Court is intimately familiar—and to the guidelines for certain white collar offenses, the visa fraud guideline has been subject to a series of Congressionally mandated enhancements not based in empirical data. Pursuant to the holding in *Kimbrough v. United States*, 552 U.S. 85 (2007), this Court should consider varying from the Guideline range, or at least give it less weight in the overall sentencing determination because the Sentencing Commission did not rely on empirical practices or data before deciding on a particular offense level. *Id.* at 109-11.

The offense levels under § 2L2.1 were increased significantly as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). IIRIRA and other 1996 immigration laws (the Antiterrorism and Effective Death Penalty Act of 1996) were, in large part, a response to the 1993 World Trade Center and other violent incidents involving immigrants. "Bill Clinton's Shameful Legacy on Immigration: 'Terrible' laws he signed 'rip apart' families and authorize unjust detention, Human Rights Watch says," *The Salon*, Apr. 27, 2016, available at http://www.salon.com/2016/04/27/bill_clintons_shameful_legacy_on_immigration_terrible_laws _he_signed_rip_apart_families_and_authorize_unjust_detention_human_rights_watch_says/.

---

[12] This is based on the current calculation in the PSR and, obviously, could change based on the Court's resolution of the disputed sentencing issues.

They are based on the false premise that illegal aliens are "dangerous." *Id*. These laws have been criticized by legal scholars and activists for having "subjected hundreds of thousands of people to arbitrary detention, fast-track deportations and family separation." *Id*. Increases to the visa fraud guideline include, for instance, raising the enhancement for 100 documents from 6 to 9. While these increases may make sense when applied to document fraud for the purpose of terrorism or violence, they do not apply to Mr. Gur's employment of Israeli immigrants—especially when those individuals were treated so well.

The high offense level brought about by the empirically-unsupported enhancements is exacerbated in this case by the double and triple counting of the same Guideline factor. For example, Mr. Gur's money laundering offense derives wholly and completely from the underlying immigration fraud. Quite simply, the kiosk business (i.e., the immigration fraud) generated revenue which led inevitably to financial transactions (e.g., depositing receipts in a bank account, paying for rent, salaries, products). *See* Statement of Facts at ¶ 19, PSR at ¶ 15. Thus, the financial transactions which constituted money laundering were incidental to the underlying immigration fraud. This is why the calculations under § 2S1.1(a)(1) essentially just incorporate the calculation for the underlying criminal activity, §2L2.1. But, despite the substantial overlap between the money laundering and immigration fraud, Mr. Gur receives an additional 4 points under § 2L2.1(b)(3) because the defendant "had reason to believe that a visa was used to facilitate the commission of a felony offense, other than an offense involving violation of immigration laws" (i.e., money laundering). In addition, because Mr. Gur was convicted under 18 U.S.C. §1956, there are an additional two (2) points assessed. Thus, for doing nothing other than engaging in mostly garden-variety financial transactions with the proceeds from the immigration fraud, Mr. Gur's offense level is increased by six levels, from 24

(51 to 63 months) to 30 (97 to 121 months) –essentially a four year enhancement at the low end of the ranges and a five year enhancement at the high end.

The arbitrary and irrational results produced by the visa fraud and money laundering guidelines are highlighted when compared to far more serious offenses that generate a similar offense level.  For example, Mr. Gur's offense level of 30 puts him at the same level as a defendant who:

- acquires and threatens to use nuclear and biological weapons and other weapons of mass destruction, and has the ability to do so (§2M6.1);

- tampers with a public water system causing permanent or life-threatening injury to multiple victims (§2Q1.4); or

- forcibly rapes someone (§2A3.1).

Mr. Gur's offense level actually is one level higher than someone who commits voluntary manslaughter (§2A1.3), two levels higher than someone who provides firearms and explosives to terrorists with the intent that they be used to commit a violent act (§2M5.3(a),(b)), and three levels higher than a defendant who attempts to murder someone (§2A2.1).  A more extensive list of offenses that produce a comparable Guideline score is attached as Exhibit 2.

## G. The Need to Avoid Unwarranted Disparities

Under 18 U.S.C. § 3553(a)(6), a district court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  *United States v. Guillermo Balleza*, 613 F.3d 434, 435 (5th Cir. 2010).  This sentencing factor requires courts to avoid "unwarranted disparities for similarly situated defendants nationwide."  *Id*.  A survey of the United States Sentencing Commission data

shows that the average immigration sentence is approximately 15-17 months and the average

fraud sentence in 27 months, well below the applicable Guidelines range in this case.[13]

Cases where defendants have been sentenced to lengthy sentences are far more egregious

than this offense. For instance, in *United States v. Seth*, the defendant was sentenced to 60

months. Judgment, Dkt. No. 299, 11-cr-424 (NRB) (S.D.N.Y. Oct. 7, 2013). In *Seth*, the

defendant was an attorney who had, over a period of years, illegally obtained *thousands* of visas

in exchange for payment.

While Mr. Genish's sentence of 60 months would seem to set a "floor" for the Court in

sentencing Mr. Gur, there are circumstances which make Mr. Gur's punishment more severe

than that of his codefendants. As previously noted, Mr. Gur's punishment will extend beyond

the length of his prison term. Unlike Mr. Genish (and the other codefendants), Mr. Gur has deep

roots in this country and has two young children (that he has not seen for 8 months) and an

American wife who will be uprooted when Mr. Gur is deported. Also unlike his codefendants,

Mr. Gur has been the subject of most of the press coverage of this offense—both in the United

States and in Israel. Mr. Gur's name and photo have been published by news media outlets

throughout the world, bringing shame and humiliation to both Mr. Gur and his family. Given

that Mr. Gur will face severe collateral consequences for his offense, even a minimal sentence

will likely be more punitive than those sentences imposed on similarly situated defendants.

### H.     The Need to Provide Restitution to Victims of the Offense

Mr. Gur has agreed on a forfeiture amount with the government in which he voluntarily

satisfied a multi-million dollar forfeiture judgment. As noted by the government, Mr. Gur's

---

[13] *See* United States Sentencing Commission, Overview of Federal Criminal Cases Fiscal Year 2015 at 9, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/2016/FY15_Overview_Federal_Criminal_Cases.pdf ; *see also* United States Sentencing Commission, Overview of Federal Criminal Cases Fiscal Year 2014 at 7, http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2015/FY14_Overview_Federal_Criminal_Cases.pdf.

voluntary forfeiture "allow[ed] the government to collect on properties, which, as rentals with multiple interested third parties, would be difficult and expensive to liquidate." Dkt. no. 296. It also spared the government from liquidation that would have "likely" resulted in "a significant amount of litigation" by interested third parties. *Id.* As noted in the PSR, restitution is not applicable in this case. PSR at 29.

### III.     CONCLUSION

For the foregoing reasons, we respectfully request that the Court vary downward from the Guideline range and sentence Mr. Gur to a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). In this case, we submit that those objectives are satisfied by a short period of incarceration, the significant voluntary forfeiture to which Mr. Gur has agreed, and his inevitable deportation from the United States.


Dated: October 20, 2016                         Respectfully submitted,


By: _____/s/_____
L. Barrett Boss (*pro hac vice*)
S. Rebecca Brodey (VA Bar No. 81163)
COZEN O'CONNOR
1200 19th Street, N.W., Suite 300
Washington, D.C. 20036
(202) 912-4818
(866) 413-0172 (fax)
bboss@cozen.com
rbrodey@cozen.com


_____/s/_____
James O. Broccoletti, Esquire (VA Bar No. 17869)
ZOBY, BROCCOLETTI & NORMILE, P.C.
6663 Stoney Point South
Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
james@zobybroccoletti.com


*Attorneys for Defendant Omer Gur*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 20, 2016, I electronically filed the foregoing Memorandum in Aid of Sentencing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

AUSA Brian James Samuels
Office of the United States Attorney
Suite 300
Fountain Plaza 3
721 Lakefront Commons
Newport News, VA 23606-0000
Brian.Samuels@usdoj.gov

AUSA Lisa Rae McKee
Office of the United States Attorney
Suite 300
Fountain Plaza 3
721 Lakefront Commons
Newport News, VA 23606-0000
Lisa.McKeel@usdoj.gov

AUSA Kevin Hudson
Office of the United States Attorney
Suite 8000
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510-1624
kevin.hudson@usdoj.gov

_____/s/_____
S. Rebecca Brodey